Eugene Paul SEEFELDT, Plaintiff,

v.

The BOARD OF TRUSTEES OF the UNIVERSITY OF the DISTRICT OF COLUMBIA and Anita Hughes, Defendants.

Civ. A. No. 78–2403.

United States District Court, District of Columbia.

Dec. 14, 1979.

Michael B. Goldstein, Washington, D. C., for plaintiff.

Office of Corp. Counsel, Washington, D. C., for defendants.

## MEMORANDUM OPINION

JOHN H. PRATT, District Judge.

Plaintiff Eugene Seefeldt, an untenured faculty member under a one-year contract with the University of the District of Columbia, has brought this action for breach of contract, wrongful discharge, interference with contractual rights, and deprivation of property without due process, as a result of the decision not to reemploy him at the expiration of his contract. The Board of Trustees of the University of the District of Columbia and Anita Hughes, Chairman of the department in which plaintiff taught, are named as defendants. This action is before the court on defendant's motion for summary judgment. For the reasons discussed below, we dismiss the first three counts of plaintiff's complaint for lack of jurisdiction and we grant summary judgment for the defendants on the issue of deprivation of a property interest without due process.

## STATEMENT OF FACTS

Plaintiff, Eugene Seefeldt, entered into an employment contract on July 12, 1971 with the Board of Higher Education and Federal City College to serve as an associate professor in the Graduate School of Federal City College. Plaintiff continued this employment, primarily on one-year contracts, until the public institutions of post secondary education in the District of Columbia were consolidated, at which time plaintiff entered into another one-year employment contract with defendant Board of Trustees of the University of the District of Columbia to serve as an associate professor in the Department of Human Ecological Systems and Services (HESS).

In December, 1975, plaintiff's evaluation by the HESS Department Evaluation Committee resulted in a recommendation that plaintiff be given a one-year terminal contract, which would end his employment with the University of the District of Columbia (UDC). To avoid this result, plaintiff wrote the chairman of the Evaluation Committee to acknowledge "slippage" in his job performance, to outline personal performance objectives which he would meet in the 1976–77 academic year, and to request that he be put on probationary status rather than on a terminal contract. This letter was characterized and accepted by the Evaluation Committee chairman and the Department chairman as a "performance contract," and plaintiff was placed on probationary status rather than on a terminal contract.

Because plaintiff was on a yearly contract, he was again evaluated by a Faculty Evaluation Committee on December 13, 1976. The Evaluation Committee gave plaintiff a satisfactory rating and recommended retention for the 1977–78 academic year at current rank and salary. HESS Department Chairman, defendant Anita Hughes, disagreed with this evaluation and recommended a one-year terminal contract, noting on the evaluation form that plaintiff had not performed all of the objectives of his performance contract. On December 16, 1976, Dean Jenkins reviewed this form and recommended "terminal contract with sufficient justification." On this same date, Dean Jenkins wrote a memorandum to defendant Anita Hughes reiterating this recommendation. Plaintiff received a copy of this memorandum. On January 25, 1977, plaintiff wrote defendant Anita Hughes saying he intended to appeal the recommendation for a one-year terminal contract. On January 31, 1977, defendant Anita Hughes and Chairman of the Evaluation Committee, Anne Hughes (no relation to Anita), met with plaintiff. At this meeting, plaintiff signed the faculty evaluation form which proposed a one-year terminal contract for the 1977–78 academic year, which form gave him a satisfactory rating and noted that "Dr. Seefeldt is seeking employment elsewhere and has been kind enough to give the department a year's notice." The form also specifically contained plaintiff's concurrence with the evaluation and a statement that he did not plan to appeal.[1] Although plaintiff had noted an intention to appeal on January 25, 1977, he pursued no administrative appellate or reconsideration procedure, as provided for in university regulations.

On December 21, 1978 plaintiff filed this action alleging breach of contract, interference with contractual rights, and wrongful discharge. The complaint was permitted to be amended to include an allegation of deprivation of property without due process of law.

## DISCUSSION

### Contractual Rights

Plaintiff's complaint states three separate counts arising directly from his one-year employment contract for the academic year 1977–78. Plaintiff's allegations are that several UDC resolutions were incorporated by reference in his contract and violated by

1. The formal one-year terminal contract was executed by plaintiff on May 15, 1977 and expired by its own terms on May 31, 1978.

UDC. Resolution 74–32 sets out procedures, including a hearing, for faculty members who have suffered an "adverse action." Resolution 75–2 grants a faculty member with plaintiff's teaching experience certain procedural safeguards for challenging a decision not to appoint him. Resolution 75–2 also provides that there shall be no arbitrary, capricious or discriminatory faculty evaluations instituted by the administration or by department chairmen. Plaintiff alleges defendant corporation violated these resolutions and that defendant Anita Hughes wrongfully, intentionally and maliciously induced defendant corporation to discharge plaintiff in violation of his contractual rights.

To fully understand these allegations and our handling of these issues, it is necessary to expand upon—and enliven—the sterile recitation of facts set forth above.

The faculty evaluation form consists of two pages. The first page contains individual ratings for specific categories, which are combined for a Total Evaluation Score. The second page contains the recommendation and signatures of the chairman of the Evaluation Committee, the chairman of the department, the division chairman, and the dean of the school. Although this seems relatively straightforward, what resulted was more than a little confusing. Apparently, there are as many as four different versions of plaintiff's evaluation form with different page ones and page twos in various combinations. Who signed or wrote what at what time and who intended what when they signed or wrote on the evaluation forms is open to some question.

A close and careful reading of several hundred pages of depositions suggests the following scenario. The initial evaluation form completed by the committee rated plaintiff "good," with a score (on page one) of 82/100. This was forwarded to defendant Anita Hughes, the department chairman, who disagreed with the recommendation, pointing out that the committee had not considered the plaintiff's failure to fully perform his performance contract. Defendant Anita Hughes asked Evaluation Committee Chairman Anne Hughes to have the committee reevaluate the plaintiff. Defendant Anita Hughes testified that at a subsequent meeting, Chairman Anne Hughes represented to her that the committee had reevaluated plaintiff and had reached a new and unsatisfactory evaluation. They then changed plaintiff's evaluation sheet to reflect a lower and unsatisfactory score (70/100). Defendant Anita Hughes testified she made the physical changes in the form with the concurrence of and in the presence of Chairman Anne Hughes. Chairman Anne Hughes does not remember whether or not the committee reevaluated plaintiff, does not remember signing the revised page one with the lower score, and is not sure that the signature in her name on that form is her signature. The other two members of the faculty evaluation committee do not recall a reevaluation of plaintiff, and they believe that the performance contract was considered by the committee in the initial evaluation. Apparently, there also was confusion whether the performance contract had to be fully performed or partially performed. Defendant Anita Hughes maintained it had be fully performed if plaintiff was to receive a satisfactory evaluation, while some members of the committee apparently felt that the contract only required good faith partial performance in order for plaintiff to receive a satisfactory evaluation. The record does not disclose a UDC policy offering guidance on this dispute.

The record, such as it is, further reveals that another page two of the evaluation form was prepared, indicating that plaintiff was signing a terminal contract because he was voluntarily seeking new employment. This page two was then affixed to the page one which gave plaintiff a good rating (82/100). The net result was the appearance that plaintiff decided to leave of his own volition when he was in good standing with UDC. Defendant Anita Hughes testified that this arrangement was done at plaintiff's request, so that he would not be prejudiced in future job seeking by a terminal contract from UDC with an unsatisfactory job rating. This evaluation form is the

document that plaintiff signed at the January 31, 1979 meeting with defendant Anita Hughes and Evaluation Committee Chairman Anne Hughes. Plaintiff does not remember much about that meeting except the names of those present. He admits that he signed the evaluation form for a terminal contract for one year, but claims that he felt coerced and intimidated by defendant Anita Hughes and felt he had no alternative but to sign the terminal contract.

We do not recite these conflicting allegations and facts to further confuse an already confused record but rather because the state of the record bears directly on our decision that plaintiff's failure to exhaust his administrative remedies deprives this court of jurisdiction to decide the merits of the contractual dispute.

■ The long-settled doctrine of exhaustion of administrative remedies provides "that no one is entitled to judicial relief for a supposed or threatened injury until the prescribed administrative remedy has been exhausted." *Myers v. Bethlehem Shipbuilding Corp.*, 303 U.S. 41, 50–51, 58 S.Ct. 459, 463, 82 L.Ed. 638 (1938).

■ The doctrine may be applied even though failure to note a timely appeal at the administrative level forecloses both administration *and* judicial review of the alleged wrong. *Kuhn v. National Association of Letter Carriers, Branch 5*, 528 F.2d 767 (8th Cir. 1976); *Olinger, et al v. Partridge*, 196 F.2d 986 (9th Cir. 1952). The doctrine is not, however, as inflexible as the above quotation from *Myers* suggests. As the Supreme Court has noted:

> The doctrine is applied in a number of different situations and is, like most judicial doctrines, subject to numerous exceptions. Application of the doctrine to specific cases requires an understanding of its purposes and of the particular administrative scheme involved.

*McKart v. United States*, 395 U.S. 185, 193, 89 S.Ct. 1657, 1662, 23 L.Ed.2d 194 (1968).

The court in *McKart* goes on to cite several purposes underlying the exhaustion doctrine. We find two of these particularly relevant here. As the court noted: ". . . judicial review may be hindered by the failure of the litigant to allow the agency to make a factual record, or to exercise its discretion or apply its expertise." *Id.* at 194, 89 S.Ct. at 1663. The confusing record we have detailed here attests to the wisdom of this particular reason for judicial restraint. Because plaintiff failed to take a timely administrative appeal, there was no factfinding at the administrative level. There was no statement of, or clarification of, certain UDC policies, such as how a "performance contract" is to be evaluated by the Faculty Evaluation Committee. The procedures actually applied in plaintiff's case were at times unclear. The record remains confused and memories have faded. Plaintiff in effect seeks to put this court in the untenable position of deciding a case on the basis of an incomplete and confused record, which could have been supplemented and clarified if *he* had exercised his rights to appeal within the university. We decline to be so embroiled.

Secondly, as the court in *McKart* noted, ". . . it is possible that frequent and deliberate flouting of administrative processes could weaken the effectiveness of an agency by encouraging people to ignore its procedures." *Id.* at 195, 89 S.Ct. at 1663. That lesson is also applicable here. We do not want to establish a precedent for this court to act as the original forum for contract disputes between faculty and the University of the District of Columbia or any other educational institution. The university has established specific procedures designed to handle the dispute now before us and the university is best equipped to deal with an incomplete record and university policies which are far from clear. Accepting jurisdiction of this case would only encourage other UDC employees to take their grievances directly to court rather than to attempt to first resolve them in the administrative forum specifically designed to accommodate such disputes.

Plaintiff argues that he did not pursue his administrative remedies because he was coerced and intimidated by defendant Anita Hughes, that he felt he had no alternative but to sign a terminal contract (which included a statement that he did not intend to appeal), that defendant Anita Hughes mislead him as to his appeal rights, and that he did not know what rights of appeal he might have. There are cases which hold that when an agency has misrepresented a party's administrative appeal rights and when the unaware party has relied upon this misrepresentation, the agency has waived the defense of exhaustion of administrative remedies. *See Ainsworth v. United States*, 180 Ct.Cl. 166 (1967); *Shubinsky v. United States*, 488 F.2d 1003 (Ct.Cl.1973). However, there is no evidence in the record that defendant Anita Hughes so misrepresented plaintiff's appeal rights. Furthermore, for us to believe that as a result of defendant Anita Hughes' actions plaintiff misunderstood and thus failed to pursue his appeal rights, as would have to believe that a man who earned a Ph.D., who had previously chaired the Faculty Evaluation Committee, and who had been acquainted with the existence of the appeal procedures since beginning his teaching assignment in 1971, would be unaware of his rights of appeal. We reject plaintiff's contention as completely incredible.

We therefore hold that the plaintiff's failure to initiate, let alone exhaust, his administrative remedies precludes this court from exercising jurisdiction on those counts stemming directly from provisions of plaintiff's one-year employment contract.

*Procedural Due Process*

Plaintiff's amended complaint alleges that defendant corporation and defendant Anita Hughes individually and in conspiracy with each other deprived him of his rights and property interest without due process of law. We are mindful of cases which hold that the exhaustion of remedies doctrine is not a bar to a court's jurisdiction when certain constitutional challenges have been raised by a plaintiff. In *American Federation of Government Employees, et al v. Acree*, 475 F.2d 1289 (D.C.Cir. 1973), this Circuit's Court of Appeals held that the exhaustion of remedies doctrine does not bar a court's jurisdiction when a constitutional challenge is made to a statute and to regulations promulgated under that statute. In *Mathews, Secretary of Health, Education & Welfare v. Eldridge*, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976), the Supreme Court held that the exhaustion of remedies doctrine does not bar a court's jurisdiction when the sole issue was a constitutional challenge to an agency's procedures. We do not hold that either of these cases are directly on point with the instant action. First, plaintiff's challenge is not solely on constitutional grounds. Secondly, although it is not clear from plaintiff's complaint, plaintiff appears to be challenging not established agency procedures themselves, but rather the failure to apply such procedures. Nevertheless, because of this possible ambiguity and because the portion of the record necessary to decide this issue is clear, we have decided to rule on this aspect of the case.

In support of the argument that he has a property interest in maintaining his employment and that he was deprived of this property interest without due process of law, plaintiff relies on *Perry, et al v. Sindermann*, 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972). The court in *Perry* held that in an action alleging deprivation of property without due process a college professor who was not officially tenured was entitled to an opportunity to prove the legitimacy of his claim to job tenure when the record indicated that the university had a *de facto* tenure policy. *Perry*, however, provides no support for plaintiff in this action.

In *Perry*, the court said that although plaintiff did not have an explicit tenure provision in his contract, the plaintiff might be able to show from the circumstances of his service and from other relevant facts that he has a legitimate claim of *entitlement* to job tenure. The court noted that: ". . . there may be an unwritten 'com-

mon law' in a particular university that certain employees shall have the equivalent of tenure." *Id.* at 602, 92 S.Ct. at 2700. The court was clearly influenced by the fact that the junior college in question had no explicit tenure system for *any* faculty members and that the college faculty guide stated that a teacher could "feel that he has permanent tenure as long as his teaching services are satisfactory and as long as he displays a cooperative attitude . . . ." *Id.* at 600, 92 S.Ct. at 2699. In the instant case, although plaintiff was not tenured, the university clearly had a tenure system. Furthermore, plaintiff can point to no resolution binding on the university at the time plaintiff's cause of action arose which establishes any form of job guarantee or entitlement beyond the terms of plaintiff's one-year contract. Plaintiff properly notes that on July 23, 1979 defendant Board of Trustees implemented a policy which would grant a "reserved interest status" to faculty members with teaching experience similar to plaintiff's. However, it is not necessary for us to decide whether such a status would allow a faculty member to maintain a due process challenge, for no such policy was in existence at the time the instant cause of action arose.

Because there were no university resolutions or policies securing plaintiff's interest in employment at UDC beyond the life of his one-year contract, the case is similar to *Board of Regents of State Colleges, et al v. Roth*, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972). In that case, the Supreme Court held that the nonretention of a university teacher on a one-year contract, absent any charges against him or stigma or disability foreclosing other employment, is not tantamount to a deprivation of liberty, and that the terms of respondent's employment accorded him no property interest protected by procedural due process. We quote from the court's opinion because we find it directly applicable here:

. . . [T]he terms of the respondent's appointment secured absolutely no interest in re-employment for the next year. They supported absolutely no possible claim of entitlement to re-employment.

Nor, significantly, was there any state statute or University rule or policy that secured his interest in re-employment or that created any legitimate claim to it. In these circumstances, the respondent surely had an abstract concern in being rehired, but he did not have a *property* interest sufficient to require the University authorities to give him a hearing when they declined to renew his contract of employment.

*Id.* at 578, 92 S.Ct. at 2710.

We accordingly hold that plaintiff has no property interest in his employment at UDC to which constitutional due process safeguards attach.