**David A. GILMORE, Appellant,**

v.

**BOARD OF TRUSTEES OF THE UNIVERSITY OF THE DISTRICT OF COLUMBIA, Appellee.**

No. 94–CV–1174.

District of Columbia Court of Appeals.

Argued Feb. 11, 1997.
Decided May 22, 1997.

---

** Associate Judge RUIZ has recused herself from this case.

Anthony Graham, Sr., Washington, DC, for appellant.

Robin C. Alexander, Assistant General Counsel, University of the District of Columbia, with whom David A. Splitt, General Counsel, and Joseph A. Julian, III, Assistant General Counsel, were on the brief, for appellee.

Before WAGNER, Chief Judge, and TERRY and FARRELL, Associate Judges.

FARRELL, Associate Judge:

This is an appeal by a former employee (Gilmore) of the University of the District of Columbia (UDC) contending that his termination as part of a reduction in force (RIF) was unlawful because his job had been erroneously classified. On administrative appeal to the Office of the President of UDC, and on a subsequent petition for review in the Superior Court, both bodies declined to decide whether the classification was erroneous, concluding that Gilmore had failed to raise the issue at the proper time by an administrative grievance attacking the misclassification directly, rather than waiting until he was terminated by a RIF. The trial court therefore denied the petition for failure to exhaust administrative remedies. We affirm, because Gilmore has offered no reason why the important benefits of the exhaustion doctrine do not dictate that his challenge to the classification came too late.

## I.

Gilmore was originally hired by UDC as an Electrical Worker in the Career Service. On August 1, 1991, he received a promotion to the position of Facilities Maintenance Coordinator. This position was designated as within the Educational Service, and, as Gilmore has conceded throughout this litigation, he was informed of his transfer from one classification to the other at the time of the promotion.[1] What he apparently (or at least assertedly) did not realize at the time was that, along with the pay raise and other benefits attending the promotion, it carried with it the vulnerability that gave rise to this case: he was subject to RIF procedures different from, and apparently less advantageous than, those applicable to Career Service employees.[2]

Aware of his reclassification on accepting the promotion, Gilmore nonetheless did not challenge it at that time. D.C.Code § 1–612.11 commits the classification of positions in the Educational Service of UDC to the Board of Trustees in accordance with policies set forth in section 1–612.1. Educational Service employees may appeal their classification to the Office of Employee Appeals (OEA). Section 1–612.11(c). Before doing so, however, they must follow the UDC grievance procedures, informal and formal. Chapter 8 DCMR § 1600.3 (1988) states, as relevant:

1. Gilmore's personnel forms at the time of the promotion informed him of his conversion to Educational Service. The forms describe the promotion as "due to reclassification," and note that his retirement benefit system will be that available only to those in the Educational Service. The forms also state that he is "converting from District Service to Administrative Schedule," citing as authority for the transfer D.C.Code § 1–609.1 (1992), the provision covering employment and advancement in the Educational Service. In his appeal to the President of UDC, Gilmore conceded that at the time of promotion the personnel representative processing the request "advised [him] that the new position, Facility Maintenance Coordinator[,] was in the Educational Services in lieu of the Career Service."

2. Educational Service employees are expressly excluded from certain protections and procedures otherwise afforded to District employees. See D.C.Code § 1–602.3(b).

A grievance [3] may consist of a complaint of dissatisfaction or dispute concerning the following:

\* \* \* \* \* \*

(b) A claimed violation, misrepresentation, or misapplication of University rules or applicable law. . . .

Before formal grievance procedures begin, an employee must "first attempt to resolve a grievance informally through discussions with his or her supervisor." 8 DCMR § 1600.5. The grievance must be "informally present[ed]" within fifteen days after the employee becomes aware of the act or occurrence giving rise to it. *Id.* § 1600.6. Failure "to prosecute" a grievance in accordance with this procedure results in its "cancell[ation]." *Id.* § 1600.7(d). When the grievance has not been resolved informally, the employee may begin a three-step formal grievance procedure (§§ 1603–1609), and may appeal administratively the resulting decision by the University. *Id.* § 1609.5. D.C.Code § 1–606.3(a) lodges jurisdiction over appeals "deciding the classification of a position" in the OEA. *See also* OEA Rule 604.1(g), 39 D.C.Reg. 7404, 7406 (1992). Once an appeal to OEA "becomes final in accordance with [D.C.Code § 1–606.3]," administrative remedies "are considered exhausted," *id.* § 1–606.3(c), and an appeal from an adverse decision may be brought in the Superior Court. *Id.* § 1–606.3(d).

As pointed out, Gilmore did not follow these procedures in 1991, but instead accepted the promotion and accompanying reclassification to the Educational Service until the RIF was instituted over a year later. The trial court concluded:

> [H]e failed to follow the grievance procedures set forth by the University as the proper method for grieving such issues. Thus, the Unive[r]sity had no opportunity to resolve the issues itself upon an adequate record. Since Gilmore failed to exhaust the administrative remedies available to him, the Court should not consider his claim of misclassification.

## II.

"[N]o one is entitled to judicial relief . . . until the prescribed administrative remedy has been exhausted." *Myers v. Bethlehem Shipbuilding Corp.,* 303 U.S. 41, 50–51, 58 S.Ct. 459, 463–64, 82 L.Ed. 638 (1938). "[A]dministrative remedies must be exhausted before judicial relief may be sought." *C Street Tenants Ass'n v. District of Columbia Rental Hous. Comm'n,* 552 A.2d 524, 525 (D.C.1989) (quoting *O'Neill v. Starobin,* 364 A.2d 149, 153 (D.C.1976)). However, "the exhaustion requirement is not in general jurisdictional in nature, but rather must be applied in accord with its purposes." *Andrade v. Lauer,* 234 U.S.App.D.C. 384, 393, 729 F.2d 1475, 1484 (1984) (as amended) (citations omitted). As the *Andrade* court explained:

> The exhaustion requirement serves four primary purposes. First, it carries out the [legislative] purpose in granting authority to the agency by discouraging the "frequent and deliberate flouting of administrative processes [that] could \* \* \* encourag[e] people to ignore its procedures." Second, it protects agency autonomy by allowing the agency the opportunity in the first instance to apply its expertise, exercise whatever discretion it may have been granted, and correct its own errors. Third, it aids judicial review by allowing the parties and the agency to develop the facts of the case in the administrative proceeding. Fourth, it promotes judicial economy by avoiding needless repetition of administrative and judicial factfinding, and by perhaps avoiding the necessity of any judicial involvement at all if the parties successfully vindicate their claims before the agency.

*Id.* (footnote and citation omitted; all alterations except the first in original). We therefore consider whether requiring Gilmore to have challenged the reclassification through the grievance process would fulfill these purposes.

---

**3.** D.C.Code § 1–603.1(10) defines a "grievance" to mean "any matter under the control of the District government which impairs or adversely affects the interest, concern, or welfare of employees."

There is no question that the asserted misclassification could have been challenged by the grievance route. Gilmore's argument on the merits is that his actual job description does not fit the statutory definition of "educational employee," D.C.Code § 1–603.1(6), so that his reclassification to that status was unlawful. The grievance process embraces "[a] claimed violation ... or misapplication of ... applicable law." 8 DCMR § 1600.3(b). Of key importance to our analysis is that by failing to follow that procedure Gilmore deprived the trial court and this court of the expertise of the OEA on the classification issue. The trial court recognized that the proper classification of Gilmore's duties was not easy; they could be said to straddle the statutory classes of Career Service and Educational Service. Certainly a reason why appellate jurisdiction over classification decisions was lodged with the OEA in the first instance is the experience and specialized knowledge it presumably would develop in sorting of such matters. At the same time, this court has held that the statutory scheme does not permit RIF appeals by Educational Service employees to be brought to the OEA. *Davis v. University of the District of Columbia,* 603 A.2d 849 (D.C.1992).[4] Gilmore acknowledged this prohibition by bringing his appeal directly in Superior Court. The result is that, by challenging his classification for the first time in a RIF appeal, he shunted the OEA out of the picture.

Furthermore, OEA itself has recognized that permitting job classifications to be challenged under the guise of a RIF appeal would be incompatible with the limited scope of review of RIF determinations. In *In the Matter of Tuteja,* TAP Docket No. 2405–0013–91 (July 2, 1992), 39 D.C.Reg. 7213, the Temporary Panel of OEA held:

the TAP does not have jurisdiction to hear a claim of prior misclassification in the process of adjudicating [an e]mployee's RIF appeal.... During its adjudication of modified RIF appeals, the TAP looks only at those matters covered by the RIF .regulations. Generally, it does not concern

itself with the validity of events that occurred prior to and apart from the RIF.

*Id.* at 4, 39 D.C.Reg. at 7216. This court has deferred to reasonable interpretations by the OEA of its jurisdiction. *See Taggart–Wilson v. District of Columbia,* 675 A.2d 28, 29–30 (D.C.1996); *Office of the District of Columbia Controller v. Frost,* 638 A.2d 657, 666 (D.C.1994). OEA's refusal to consider alleged misclassifications at this point is reasonable. As the United States Court of Appeals for the Federal Circuit has said in a similar context:

In determining the retention rights of the former employees of the Community Services Administration, the [Merit Systems Protection] Board necessarily had to look to the situation as it actually existed in that agency when the reduction in force took place on September 30, 1981, and not to the situation that might or should have existed on that date. It would be almost impossible to determine the retention rights of employees affected by a reduction in force or transfer of function if the correctness of the classification of the positions the employees held had to be reexamined. Reductions in force deal with actual and not theoretical or possible situations.

*Menoken v. Department of Health & Human Servs.,* 784 F.2d 365, 368–69 (Fed.Cir.1986); *see also Biddle v. United States,* 195 U.S.App.D.C. 263, 602 F.2d 441 (1979) (per curiam) (complaints of pre-RIF treatment not proper issue of RIF appeal subject to review of Federal Employee Appeals Authority; instead these had to be raised within agency grievance procedures). If OEA can properly refuse to reexamine a classification as part of a RIF appeal, there is even less reason why courts should do so deprived of an agency record and the agency's expertise in such matters.

Requiring an employee in Gilmore's shoes to have pursued the grievance process serves additional purposes of exhaustion beyond assuring the courts the input of the OEA. A

4. Regarding the claim by the appellant in *Davis* that he had been denied an adequate hearing before being RIF'd, the court stated: "[A]ppel-

lant may invoke the general equitable jurisdiction of the Superior Court so that he would be afforded a right to a hearing." 603 A.2d at 853.

timely grievance challenging the misclassification would have allowed UDC, among other options, to redefine the duties the position entailed so as to remove uncertainty about its classification and the grounds for a future legal dispute such as this. And, depending on the outcome of the process, a timely grievance would have enabled Gilmore to decide whether to take the good with the bad (*i.e.,* the increased vulnerability) of the promotion rather than accepting the benefits and challenging his status only later when the burdens of the higher position materialized. *See Evenrud v. Park & Recreation Bd. of City of Minneapolis,* 310 Minn. 234, 245 N.W.2d 609, 612 (1976) (employees who accepted reclassification and worked at new job for almost two years before filing objection waived rights to do so). As "precisely the kind [of claim] that should have been pursued in the grievance procedure," *Andrade,* 234 U.S.App.D.C. at 395, 729 F.2d at 1486, claims of misclassification asserted in opposition to a RIF can only complicate unnecessarily procedures already made complex enough by such issues as retention rights and standing, Ch. 18, UDC Regulations, § 1805.1 *et seq.,* 39 D.C.Reg. 4795, 4799 *et seq.* (1992), and the like.

 Gilmore argues that UDC exceeded its "statutory grant" in classifying him within the Educational Service, and that this quasi-"jurisdictional" taint underlying the RIF excused his failure to exhaust administrative remedies. But this is no more than an argu-

ment that the reclassification was plainly wrong, and courts have never accepted "the view that administrative remedies need not be exhausted if the administrative action complained of is clearly erroneous." *Young v. Higley,* 95 U.S.App.D.C. 122, 123, 220 F.2d 487, 488 (1955) (per curiam). *Goode v. Antioch Univ.,* 544 A.2d 704 (D.C.1988), relied on by Gilmore, is a very different case from this one: there the administrative body (the D.C. Educational Institutional Licensure Commission) lacked "statutory jurisdiction" to hear claims such as the one Goode asserted, which involved a private contract dispute for money damages. *Id.* at 706. Unlike in *Goode,* UDC and OEA had "statutory authority to afford [Gilmore] an administrative remedy," *id.;* he simply did not avail himself of it. Gilmore's RIF appeal to the President of UDC was "futile" only because it attempted to substitute for an administrative remedy he had forfeited.[5]

We affirm the denial of the petition for review for failure to exhaust administrative remedies.

*So ordered.*

---

5. Of course, the expiration of Gilmore's right to file a grievance regarding his misclassification does not trigger the futility exception. *Seefeldt v. Board of Trustees,* 487 F.Supp. 230 (D.D.C.1979) ("The [exhaustion] doctrine may be applied even though failure to note a timely appeal at the

administrative level forecloses both administrati[ve] *and* judicial review of the alleged wrong.") *Id.* at 233 (emphasis in original) (citing *Kuhn v. National Ass'n of Letter Carriers, Branch 5,* 528 F.2d 767 (8th Cir.1976); *Olinger v. Partridge,* 196 F.2d 986 (9th Cir.1952)).