Sharon ANDRADE et al., Appellants,

v.

Charles A. LAUER, Acting Administrator, Office of Juvenile Justice, et al.

No. 82–1880.

United States Court of Appeals,
District of Columbia Circuit.

Argued Sept. 16, 1983.

Decided March 23, 1984.

As Amended April 16, 1984.

Mona Lyons, Washington, D.C., with whom John W. Karr, Washington, D.C., was on the brief, for appellants.

Carolyn B. Kuhl, Deputy Asst. Atty. Gen., Dept. of Justice, Washington, D.C., with whom J. Paul McGrath, Asst. Atty. Gen., Dept. of Justice, Washington, D.C., Stanley S. Harris, U.S. Atty., Washington, D.C., at the time the brief was filed, and William G. Kanter, Atty., Dept. of Justice, Washington, D.C., were on the brief, for appellees.

Before WRIGHT, MIKVA and GINS-BURG, Circuit Judges.

Opinion for the court filed by Circuit Judge J. SKELLY WRIGHT.

J. SKELLY WRIGHT, Circuit Judge:

This case presents a challenge to the procedures used and the authority exercised by officials of the Department of Justice in planning and implementing a reduction in force (a "RIF") in early 1982. Appellants are or were government employees who brought suit in the United States District Court for the District of Columbia, alleging that the procedures used in the RIF violated federal personnel regulations and congressional enactments, and that the individuals who were responsible for the RIF held office in violation of the Appointments Clause, Art. II, § 2, cl. 2 of the Constitution. The attempt of appellants to maintain this action raises a potpourri of justiciability issues, one of which involves an ancient doctrine concerning the appropriate way to challenge a public official's title to office. The District Court dismissed their action on a variety of grounds, including lack of ripeness, failure to exhaust administrative remedies, and lack of standing. We affirm in part and reverse in part, and remand to the District Court for further proceedings.

## I. FACTUAL SETTING

Appellants in this case are or were employees of the Office of Juvenile Justice and Delinquency Prevention (OJJDP), an agency with approximately 65 employees. Under the agency's organic statute, the Juvenile Justice and Delinquency Prevention Act of 1974 as amended, codified at 42 U.S.C. §§ 5601–5751 (1976 & Supp. V 1981), the purpose of the OJJDP is to administer federal programs dealing with juvenile delinquency. OJJDP is one of a group of five agencies housed within the Department of Justice under the general authority of the Attorney General. Among the five agencies is also the Office of Justice Assistance, Research, and Statistics (OJARS), which is assigned the responsibility of "provid[ing] staff support to, and coordinat[ing] the activities of" the other four agencies. 42 U.S.C. § 3781(b) (Supp. V 1981).[1]

Another of the five agencies within this division of the Department of Justice is the Law Enforcement Assistance Administration (LEAA). Congress has not appropriated any new grant funding for LEAA since 1979. Therefore, when the events at issue in this suit occurred the size of LEAA's staff was being reduced as the agency was being phased out of existence.[2]

Federal personnel regulations mandate a specific procedure to be used to determine who will be laid off in a RIF like that which became necessary as the result of the liquidation of LEAA. Insofar as is relevant here, regulations require that employees compete with each other on the basis of seniority for remaining jobs within a system of "competitive areas" and "competitive levels." A "competitive area" is the grouping in which "employees compete for retention" in the event of a reduction in force. 5 C.F.R. § 351.402(a).[3] The "stan-

---

**1.** The other agencies are the National Institute of Justice, the Bureau of Justice Statistics, and the Law Enforcement Assistance Administration. 42 U.S.C. § 3781(b) (Supp. V 1981). The Juvenile Justice Amendments of 1980, Pub.L. No. 96–509, 94 STAT. 2750 (1980), provided that the OJARS shall have the same role with respect to OJJDP as it had with respect to these other agencies.

**2.** This case is before this court on appeal from the District Court's dismissal for lack of subject-matter jurisdiction. Therefore, in what follows we take as true appellants' version of the underlying facts.

**3.** All citations to the Code of Federal Regulations in this opinion are to the 1983 edition. None of the regulations at issue have materially changed since the events at issue in this case.

dard for a competitive area is that it include all or that part of an agency in which employees are assigned under a single administrative authority." 5 C.F.R. § 351.-402(b). A "competitive level" consists of "all positions in a competitive area and in the same grade or occupational level which are sufficiently alike in qualification requirements, duties, responsibilities, pay schedules, and working conditions, so that an agency readily may assign the incumbent of any one position to any of the other positions without changing the terms of his appointment or unduly interrupting the work program." 5 C.F.R. § 351.403(a).

Because a given competitive area or competitive level seems usually to include only employees within a given agency, a RIF of the kind involved in this case would ordinarily have affected only LEAA's own employees. However, when the need for terminating LEAA became apparent, the Administration decided to place OJJDP positions in the same competitive area and competitive level as LEAA positions. Appellants allege that the effect of joining the agencies together in this way was that, as LEAA lost positions, the employees with the least seniority—regardless whether they originally worked for LEAA or OJJDP—would be laid off. If the low-seniority employees were originally from OJJDP, the displaced LEAA employees with more seniority would take the now-open positions. Appellants allege that, because LEAA is considerably older as an agency than OJJDP, LEAA employees in fact tend to have more seniority than OJJDP employees, and the result of the merging of competitive areas and levels and the RIF at LEAA would be that many employees at OJJDP could lose their jobs.

On December 3, 1981 all of the appellants received a document entitled "Notification of Reduction in Force" from appellee Robert Diegelman, acting director of OJARS. In accord with 5 C.F.R. § 351.803, Diegelman stated in the notice that there would be a RIF some time early in 1982,

and that "we do not know whether you will be able to remain in your present position, or if some other action will affect your employment." Affidavit of Emily C. Martin, Director, Special Emphasis Division of OJJDP, at 3, Appendix (App.) 24 (*quoting* Notification of Reduction in Force from Robert Diegelman). On February 26, 1982 the agency formally notified 14 OJJDP employees that they would be laid off or demoted in a RIF to be implemented on March 26, 1982. Among the employees to be laid off or demoted were seven of the appellants.

On March 25, 1982 the seven appellants scheduled to be laid off or demoted on the following day, along with 21 other OJJDP employees who feared they would lose their jobs in future RIFs made necessary as a result of the termination of LEAA, filed this action in the District Court. Defendants were Diegelman, Lauer (the Acting Administrator of OJJDP), OJJDP itself, OJARS, the Attorney General, and the Department of Justice. Appellants sought declaratory and injunctive relief against implementation of the RIF on three grounds. First, they claimed that the way in which the RIF was to be implemented violated federal personnel regulations. They alleged that, because the professional positions at LEAA are not interchangeable with those at OJJDP, Diegelman and Lauer ignored regulations of the Office of Personnel Management[4] that state that only positions with the same duties and responsibilities can be placed in the same competitive level. Similarly, they urged that, because OJJDP is administratively distinct from LEAA, appellees violated regulations whose import was that separate agencies should be in separate competitive areas.[5] For the sake of simplicity, we will refer to these claims as appellants' "personnel claims." Second, they alleged that combining LEAA and OJJDP personnel in the same competitive area would violate the congressional determination to give OJJDP autonomy; this determination was alleged-

---

4. *See* note 19 *infra* & accompanying text.

5. *See* note 20 *infra* & accompanying text.

ly evidenced by the grant to OJJDP of the power to select and appoint its own employees.[6] This will be referred to as appellants' "statutory claim." Third, appellants alleged that the two officials who planned and executed the reduction in force, Diegelman and Lauer, are occupying their offices in violation of the Appointments Clause of the Constitution, Art. II, § 2, cl. 2, in that neither official has been appointed by the President or confirmed by the Senate. Therefore, appellants challenge the authority of Diegelman and Lauer to implement the RIF. We will refer to this challenge as appellants' "constitutional claim."

Plaintiffs sought a preliminary injunction against the RIF, which was implemented as scheduled on March 26. Defendants filed a motion to dismiss the complaint on a variety of grounds, including lack of standing and ripeness and the failure of plaintiffs to exhaust their administrative remedies. On June 30, 1982 the District Court issued an unpublished opinion and order denying appellants' motion for a preliminary injunction and dismissing the complaint. The District Court seems to have held that the 21 plaintiffs who had not been affected by the RIF of March 26 failed to present a ripe claim. The court also held that the remaining seven plaintiffs had failed to exhaust administrative remedies available to them under the grievance procedures of their union's contract with the Department of Justice and had no standing to challenge the propriety of tenure of Diegelman or Lauer. Appellants are here appealing from this order.

We affirm the District Court's order with respect to the 21 appellants who were neither fired nor demoted (hereinafter referred to as the "nonfired appellants"). In addition, we hold that, with respect to the personnel and statutory claims of the remaining seven appellants, the District Court correctly refused to hear their claims prior to exhaustion of their administrative remedies. However, we hold that the District Court incorrectly held that appellants lack standing to bring their constitutional claim. Although their constitutional claim implicates a number of other justiciability doctrines, we hold that appellants should be permitted to litigate it, and remand for further proceedings on this claim only. Because each of these holdings raises rather different issues, we will discuss each in turn.

## II. RIPENESS

The District Court held that the 21 nonfired appellants did not present the court with a "ripe controversy proper for judicial resolution." Memorandum Opinion in Civil Action No. 82–848 (June 30, 1984) (Dist.Ct. Op.) at 2, App. 118. The inquiry into ripeness must begin with the bipartite test enunciated by the Supreme Court in *Abbott Laboratories v. Gardner*, 387 U.S. 136, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967). *Abbott* held that to evaluate whether a case is ripe a court must pragmatically test "the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." *Id.* at 149, 87 S.Ct. at 1515. *See also Ass'n of Nat'l Advertisers, Inc. v. FTC*, 617 F.2d 611, 620 (D.C.Cir. 1979). "This two-pronged inquiry in essence requires the court to balance its interest in deciding the issue in a more concrete setting against the hardship to the parties caused by delaying review." *Webb v. Dep't of Health & Human Services*, 696 F.2d 101, 106 (D.C.Cir.1982).[7]

---

**6.** *See* 42 U.S.C. § 5612(a) (1976) ("The Administrator is authorized to select, employ, and fix the compensation of such officers and employees, including attorneys, as are necessary to perform the functions vested in him and to prescribe their functions."). Before the passage of the Juvenile Justice Amendments of 1980, Pub.L. No. 96–509, 94 STAT. 2750, OJJDP had been operated as a division of LEAA. *See* 42 U.S.C. § 5611 (1976). Section 6 of the 1980 Amendments, 94 STAT. 2752, changed § 5611 to

constitute OJJDP as a separate agency with its own Administrator, on a par with LEAA within the Department of Justice. After the changes the word "Administrator" in § 5612(a), which previously had referred to the Administrator of LEAA, came to refer to the Administrator of OJJDP.

**7.** To be sure, most of the cases in this circuit in which the ripeness issue has arisen have been cases in which plaintiffs challenged agency reg-

■ The first part of the *Abbott Laboratories* test involves consideration of the fitness of the issues for judicial decision. In the context of this case this is primarily an inquiry into whether the factual setting of the case is sufficiently clear to be susceptible to adjudication. Appellants' filings raise a number of factual issues, none of which can be dealt with as long as appellants are attempting to gain declaratory and injunctive relief against a RIF that remains hypothetical. For instance, the validity of appellants' personnel and statutory claims depends vitally on the precise way in which future RIFs are implemented; if appellees in the future were to define "competitive level" and "competitive area" somewhat differently than they did for purposes of the March 26 RIF, a future RIF could perhaps affect both LEAA and OJJDP without running afoul of the personnel regulations and without intruding on the statutory autonomy that appellants claim was violated here. Moreover, appellants themselves believe that the impact of the RIF on the ability of OJJDP to perform its statutory functions is of vital importance in assessing the validity of the RIF. *See* brief for appellants at 9–13, 16–17, 28, 33–35. Although the effects of the RIF of March 26, 1982 could be adequately assessed by the District Court, the effects of some later RIF of uncertain scope—which may or may not affect some or all of the remaining 21 appellants—must necessarily be highly speculative; thus, the very importance of the issue of how the RIF affects the functioning of OJJDP precludes litigation of these claims until the agency has begun to implement the RIF and its effects can be determined.

■ If the personnel and statutory claims of these 21 appellants are inappro-

priate for judicial resolution until their legal issues are presented in a less hypothetical setting, their constitutional claims are even less fit for adjudication at this time. Aside from our general reluctance to entertain constitutional claims outside a specific factual setting, the validity of the particular constitutional claim asserted here turns on the identity of the individual who is responsible for the RIF and the validity of that person's claim to office at the time of the RIF.[8] Yet because these appellants complain only of the possibility of some future, hypothetical RIF, neither the identity of the individual responsible for planning the RIF nor the constitutional status of that individual's title to office can be determined. Their constitutional claim is therefore at present inappropriate for judicial resolution.

■ Appellants argue, citing *Steffel v. Thompson*, 415 U.S. 452, 94 S.Ct. 1209, 39 L.Ed.2d 505 (1974), that plaintiffs do not necessarily have to wait to bring their claim until an illegal action occurs. Instead, a court may look to the announced intentions of the defendants to take adverse action against the plaintiffs in deciding whether a dispute has matured to the point at which it is a case or controversy. We agree with appellants that, had appellees taken action indicating their firm intention to lay off appellants and had that action made their separation or demotion imminent, such action would have constituted an announced intention sufficient to fill in the necessary factual setting for judicial resolution of their claims.[9] A court could then assume that appellees were willing to carry out their announced intentions in the context of the factual setting at the time of the announcement. This assump-

ulations or ongoing agency proceedings before the regulations had been enforced against them, *see, e.g., Nat'l Wildlife Federation v. Marsh,* 665 F.2d 390 (D.C.Cir.1981); *Ass'n of Nat'l Advertisers v. FTC,* 617 F.2d 611 (D.C.Cir.1979); *Diamond Shamrock Corp. v. Costle,* 580 F.2d 670 (D.C.Cir.1978), or before the proceedings had been completed, *see, e.g., Gulf Oil Corp. v. Dep't of Energy,* 663 F.2d 296 (D.C.Cir.1981). But the principles that governed these cases are applicable as well here, where the validity of agency

regulations or ongoing agency regulatory proceedings are not at issue.

8. *See* discussion in Part IV–C *infra.*

9. This would have been particularly true if they had, at the same time, presented convincing allegations of irreparable injury, thereby meeting the second half of the *Abbott* test.

tion would make possible a judicial investigation into the effects of the supposedly imminent RIF, the methods by which it would be carried out, and the individuals responsible for planning and implementing it.

However, appellants fail to provide any substantial support for their allegations that appellees did announce their intention to lay off the 21 nonfired appellants. To demonstrate such an announced intention in the context of this case appellants would have to show that appellees intend both to make future layoffs and to make them in the allegedly illegal manner to which appellants object. But appellants are able to point to only two statements made by Department of Justice officials that supposedly directly threatened their jobs. *See* brief for appellants at 19 n. 38. First, they cite a memorandum from Diegelman dated April 15, 1982 to the employees of all five agencies within this division of the Department of Justice. In this letter, which followed the RIF of March 26, 1982, Diegelman noted that "further reductions are likely to be required" in the coming year and that "[e]ven if funding were restored for the Juvenile Justice program, * * * personnel cuts would still occur. Currently the only way to ease pressure on our personnel ceiling is for agency attrition to run high—8 to 10 employees to leave voluntarily each month." Memorandum to All JSIA Employees from Robert F. Diegelman, Acting Director, April 15, 1982, at 2, App. 81. On its face, this letter is not sufficient to create an imminent threat of future layoffs. Although it does warn of the possibility of some personnel cuts, it also points out that such cuts may be avoided if attrition rates

run sufficiently high. Moreover, the letter was addressed to employees of all five agencies within this division of the Department of Justice. Its reference to the possibility of further reductions therefore should be read as a reference to the possibility that some layoffs may be required in some of the agencies; it cannot be read to announce an intention to take adverse personnel action against these 21 appellants.[10] Consequently, the letter articulates neither an imminent threat to carry out layoffs nor an intent to take adverse personnel action against these appellants. It therefore cannot help remedy the lack of a factual setting here.

Second, they cite an account of a meeting at which Ralph Muros, the Justice Department's Administrator for Support Operations, allegedly said that "additional terminations are expected to displace a total of 90% of the OJJDP staff by September 30, 1982."[11] Affidavit of David D. West, Director, Formula Grants and Technical Assistance Division of OJJDP, at 4, App. 21. Yet appellants do not make any allegations as to the existence or source of any authority that Mr. Muros may have had to implement the RIF or to announce the intentions of the Department of Justice with respect to the matter. We are unwilling to read such an isolated, informal statement by a single official of uncertain authority to create an imminent threat to appellants. The statutory scheme provides for a formalized RIF procedure in which the agency must in most circumstances give affected employees 30 days advance notice of demotions or dismissals. *See* 5 C.F.R. §§ 351.801–351.-804. This provision serves the important

10. We should not be understood to imply that a statistical probability of harm to appellants would necessarily be insufficient to make the case-appropriate for judicial resolution. Rather, the inquiry must be whether appellees have announced a definite intention sufficient to supply the necessary factual setting. Although the Diegelman letter does raise the vague possibility of future layoffs, it fails to give any indication how these layoffs would occur or whom they would affect. If the letter had indicated that action would be taken against these appellants, or even if the letter had merely raised a substan-

tial likelihood that action would be taken against these appellants, it might have helped supply the missing factual context for appellants' claims.

11. Mr. Muros vigorously denies the accuracy of appellants' reports of his remarks. Affidavit of Ralph L. Muros, Assistant Director, Office of Operations Support of OJARS, at 2, App. 47. However, in the absence of any findings on the issue, we take appellants' allegations as to his remarks as true for the purposes of this appeal.

function of officially announcing the intentions of the agency to take adverse action against employees. Given our general reluctance to interfere in the finely-articulated statutory/regulatory scheme governing federal personnel practices, we are particularly reluctant to accept such an informal communication—without a substantial showing of genuine authority—as an official announcement of agency intentions. *Cf. Sampson v. Murray*, 415 U.S. 61, 94 S.Ct. 937, 39 L.Ed.2d 166 (1974).

■ The second half of the *Abbott Laboratories* test inquires into the hardship the plaintiffs would suffer if relief is withheld at this time. Although anticipatory challenges to governmental action, in which plaintiffs challenge action not yet taken by government officials, are the exception and not the rule, such anticipatory challenges can be permitted when plaintiffs can show that delay would cause unusual hardship. For instance, when the controversy has become sufficiently concrete to be susceptible of judicial resolution (thus meeting the first half of the *Abbott Laboratories* test) and plaintiffs would suffer serious injury to important constitutionally protected interests, anticipatory challenges may be permitted. *See, e.g., Babbitt v. United Farmworkers Nat'l Union*, 442 U.S. 289, 301–303, 99 S.Ct. 2301, 2310–2311, 60 L.Ed.2d 895 (1979); *Steffel v. Thompson, supra*, 415 U.S. 452, 94 S.Ct. 1209, 39 L.Ed.2d 505; *Kaplan v. Hess*, 694 F.2d 847, 850–851 (D.C.Cir.1982). Similarly, if the mere promulgation of administrative regulations would impose "debilitating uncertainties" on the parties, *see* 4 K. Davis, Administrative Law Treatise § 25:16, at 410–411 (2d ed. 1983), before the regulation's validity could be tested in an enforcement proceeding, an anticipatory action to test the validity of the regulation may be permissible. *See, e.g., Abbott Laboratories, supra*, 387 U.S. at 152–153, 87 S.Ct. at 1517; *Conti-*

*nental Air Lines, Inc. v. CAB*, 522 F.2d 107, 128 (D.C.Cir.1975) (*en banc*). *See also Gulf·Oil Corp. v. Dep't of Energy*, 663 F.2d 296, 311–313 (D.C.Cir.1981) (issue ripe where lengthy delay might permanently prejudice parties' legal rights).

■ In contrast to these cases where severe hardship militated toward early adjudication, the 21 nonfired appellants are not able to demonstrate on this record that they would suffer *any* significant hardship if their case were dismissed now. To be sure, they will suffer some uncertainty in not knowing whether they will be able to keep their jobs indefinitely. But this uncertainty is hardly the kind of uncertainty that could in some circumstances compensate for the lack of a factual setting for the claims they present. As we pointed out above, government regulations provide that employees to be dismissed in a RIF must be given formal notice at least 30 full days before the RIF takes place. 5 C.F.R. §§ 351.801(a), 351.802.[12] Under these regulations, the 21 nonfired appellants in fact could be certain that a RIF affecting them was *not* imminent at the time they filed their action. Therefore, in the absence of any demonstration that appellants would suffer any injury to their substantial rights, intervention in the internal operations of the Executive Branch to relieve them of mere subjective uncertainty would be inappropriate. *Cf. Sampson v. Murray, supra*, 415 U.S. at 88–92, 94 S.Ct. at 951–953 (noting that even discharge from job may not constitute sufficient irreparable injury to justify issuance of preliminary injunction against discharge).

In short, the 21 nonfired appellants were unable to present the District Court with a controversy ripe for judicial resolution, both because their claims depended vitally on factual issues whose determination was impossible while the RIF affecting them remained merely speculative, and because

12. Appellants did receive a general notice on December 3, 1981, *see* 5 C.F.R. § 351.803, which would have allowed the government to lay off appellants only five days after they received a specific notice under § 351.801. However, the December general notice expired early in March, as such notices are good only for 90 days. *See* 5 C.F.R. §§ 351.803, 351.801(b). Therefore, as of the date of this action appellants were once again entitled to at least 30 days notice before they could be laid off in a future RIF.

they were unable to demonstrate that delaying their litigation would cause them any serious injury or would injure the exercise of any substantial rights. Pursuant to the principles of *Abbott Laboratories,* we therefore affirm the District Court's dismissal of the claims of these 21 appellants.

### III. EXHAUSTION OF ADMINISTRATIVE REMEDIES

The District Court dismissed the claims of the remaining seven appellants [13] because they had failed to exhaust administrative remedies available to them under the collective bargaining agreement between their union and the Department of Justice. In this section we affirm the District Court's treatment of their personnel and statutory claims and reverse the District Court's ruling with respect to their constitutional claims.

■■■■ Exhaustion of available administrative remedies is in general a prerequisite to obtaining judicial relief for an actual or threatened injury. *Myers v. Bethlehem Shipbuilding Corp.,* 303 U.S. 41, 50–51, 58 S.Ct. 459, 463–464, 82 L.Ed. 638 (1938); *accord Aircraft & Diesel Equipment Corp. v. Hirsch,* 331 U.S. 752, 767, 67 S.Ct. 1493, 1500, 91 L.Ed. 1796 (1947); *Athlone Industries v. CPSC,* 707 F.2d 1485, 1488 (D.C.Cir.1983); *Wallace v. Lynn,* 507 F.2d 1186 (D.C.Cir.1974). However, the exhaustion requirement is not in general jurisdictional in nature, *see, e.g., Beins v. United States,* 695 F.2d 591, 599 (D.C.Cir.1982); *accord United States v. California Care Corp.,* 709 F.2d 1241, 1248 (9th Cir.1983); *Haitian Refugee Center v. Smith,* 676 F.2d 1023, 1034 (5th Cir. Unit B 1982); *Cerro Metal Products v. Marshall,* 620 F.2d 964, 970 (3d Cir.1980), but rather must be applied in accord with its purposes. *See, e.g., McKart v. United States,* 395 U.S. 185, 193–195, 89 S.Ct. 1657, 1662–63,

23 L.Ed.2d 194 (1969); *Athlone Industries, supra,* 707 F.2d at 1488; *American Federation of Gov't Employees v. Acree,* 475 F.2d 1289 (D.C.Cir.1973) (*per curiam*). "[W]hen the reasons supporting the doctrine are found inapplicable, the doctrine should not be blindly applied." *Committee for GI Rights v. Callaway,* 518 F.2d 466, 474 (D.C.Cir.1975).

■■■ The exhaustion requirement serves four primary purposes.[14] First, it carries out the congressional purpose in granting authority to the agency by discouraging the "frequent and deliberate flouting of administrative processes [that] could * * * encourag[e] people to ignore its procedures." *McKart, supra,* 395 U.S. at 195, 89 S.Ct. at 1663. Second, it protects agency autonomy by allowing the agency the opportunity in the first instance to apply its expertise, exercise whatever discretion it may have been granted, and correct its own errors. Third, it aids judicial review by allowing the parties and the agency to develop the facts of the case in the administrative proceeding. Fourth, it promotes judicial economy by avoiding needless repetition of administrative and judicial factfinding, and by perhaps avoiding the necessity of any judicial involvement at all if the parties successfully vindicate their claims before the agency. *See generally McKart, supra.* We therefore direct our inquiry into whether requiring exhaustion of appellants' personnel, statutory, and constitutional claims would serve these purposes.

### A. *Personnel and Statutory Claims*

In order to analyze the application of the exhaustion doctrine, we must first outline the specific statutory and contractual grievance procedure available to appellants as an administrative remedy in this case. The collective bargaining agreement between appellants' union and the Depart-

---

**13.** In the balance of this opinion we will use the term "appellants" to refer to only the seven appellants who lost their jobs or were demoted in the RIF of March 26, 1982.

**14.** We have often recognized these purposes underlying the exhaustion requirement, though we

have not always grouped them into four categories, as here. *See, e.g., Athlone Industries v. CPSC,* 707 F.2d 1485, 1488 (D.C.Cir.1983); *Beins v. United States,* 695 F.2d 591, 599 (D.C.Cir. 1982); *Committee for GI Rights v. Callaway,* 518 F.2d 466, 474 (D.C.Cir.1975).

ment of Justice (hereinafter referred to as the Negotiated Agreement) provides for a series of steps to be used for employee grievances "concerning any claimed violation, misinterpretation, or misapplication of any law * * *, rule, or regulation affecting the conditions of employment." Negotiated Agreement, Art. XXIV, § 1 at 115, *reprinted in* Addendum C to brief for appellees at 2. The first step is for the employee to appeal to a "management official with the authority to grant or effectively recommend to the Administrator the resolution proposed in the grievance." *Id.* § 8 at 117, Addendum C at 4. In the case of the RIF of March 26 appellee Lauer seems to have designated Mr. H.F. Sylvester, Acting Deputy Administrator of the Office of Operations Support, to handle this first stage of the grievance process. *See* Memorandum to Kathy Reyering, President, AFSCME Local 2830, March 1, 1982, App. 82. If the employee is unhappy with Sylvester's disposition of the grievance, the employee should then pursue the second step of the grievance procedure by bringing the grievance to the "Head" of OJARS, appellee Diegelman. Negotiated Agreement, Art. XXIV, § 8, Step 2 at 118, Addendum C at 5; *see also* App. 82 (memo from Lauer to union stating that Diegelman "has been delegated the authority to make final management decisions in the RIF").

There seem to be no further steps that an individual employee may take if that employee is dissatisfied with Diegleman's decision. However, the union may trigger a third stage of the grievance procedure by referring the matter to arbitration.[15] Negotiated Agreement, Art. XXIV, § 8 at 118, Addendum C at 5. Finally, either party may appeal an arbitrator's award to the Federal Labor Relations Authority. *Id.,* Art. XXV, § 7 at 117, Addendum C at 8. The status of a further appeal from the FLRA decision to the courts is unclear.[16]

The Negotiated Agreement explicitly states that "[t]his procedure shall be the exclusive procedure available to employees in the unit for resolving grievances," with some exceptions not relevant here. *Id.,* Art. XXIV, § 5 at 116, Addendum C at 3. In cases involving "adverse action" under 5 U.S.C. § 7512 (1982),[17] the employee has the choice of utilizing the statutory/contractual grievance procedure or appealing to the Merit Systems Protection Board. 5 U.S.C. § 7121(e)(1) (1982); *see Local 2578, American Federation of Gov't Employees v. GSA,* 711 F.2d 261, 264 (D.C.Cir.1983). But Congress has mandated that collective bargaining agreements contain provisions establishing this kind of grievance procedure as an *exclusive* remedy in cases involving RIFs, which are not "adverse ac-

15. Appellants have contended that their union, which represented both the employees of OJJDP and the employees of LEAA, would not have sought arbitration in this case. Therefore, they argue, they should be permitted to bring their suit against their employer in federal court. Appellees, on the other hand, contend that appellants' remedy for the union's breach of its duty of fair representation is a suit against the union, not against their employer. We need not reach this issue because we agree with the District Court that, at least as of the date they brought this action, *see* note 18 *infra,* appellants had not exhausted the grievance procedures available to them. *See* Dist.Ct.Op. at 4 n. 4, App. 120. The issue whether appellants would be able to maintain a suit against their employer if the union had blocked certain stages of the administrative process would only arise if appellants could show that they had taken advantage of those stages of the process that were available regardless of the union's alleged refusal to act.

16. In certain circumstances the FLRA's enabling statute gives the Courts of Appeals jurisdiction to review FLRA decisions. *See* 5 U.S.C. § 7123(a) (1982). But the statute specifically exempts FLRA decisions concerning arbitration awards from the circuit court's jurisdiction, unless the FLRA decision involves an unfair labor practice. *See id.* § 7123(a)(1); *U.S. Marshals Service v. FLRA,* 708 F.2d 1417 (9th Cir.1983); *see also* 5 U.S.C. § 7116 (1982) (defining "unfair labor practice"). Because it is unlikely that an unfair labor practice would be involved in an FLRA decision in this case, it is unlikely that appeal would go to the Court of Appeals. *See* note 24 *infra.*

17. This section defines adverse action cases as those involving removal, suspension for more than 14 days, reduction in grade, reduction in pay, or furlough of 30 days or less. It specifically provides that cases involving RIFs are not adverse action cases. 5 U.S.C. § 7512(B) (1982).

tion" cases for purposes of the statute and the Negotiated Agreement. 5 U.S.C. § 7121(a)(1) (1982).

 The District Court held that appellants' "basic claim that the agency improperly included OJJDP employees in a particular competitive [level and area] for purposes of the RIF" was well "within the scope of the grievance and arbitration procedure and the expertise of the Federal Labor Relations Authority." Dist.Ct.Op. at 4, App. 120. Whether styled as a statutory or a personnel claim, this "basic claim" is precisely the kind that should have been pursued in the grievance procedure, and we therefore agree with the District Court that appellants were obligated to proceed in the first instance in accord with the statutory/contractual grievance procedure.[18]

1. *Personnel claims.* Appellants' personnel claims essentially consist of two claims arising out of federal regulations governing the meaning of "competitive area" and "competitive level." These regulations define a "competitive level" to

consist[ ] of all positions in a competitive area and in the same grade or occupational level which are sufficiently alike in qualification requirements, duties, re-

sponsibilities, pay schedules, and working conditions, so that an agency readily may assign the incumbent of any one position to any of the other positions without changing the terms of his appointment or unduly interrupting the work program. * * *

5 C.F.R. § 351.403(a).[19] Appellants' first claim is that this regulation was violated when positions at OJJDP involving particularized and extensive experience in the field of juvenile delinquency prevention were placed in the same competitive level with positions at LEAA requiring no such experience. The regulations also state that "[t]he standard for a competitive area is that it include all or that part of an agency in which employees are assigned under a single administrative authority." 5 C.F.R. § 351.402(b).[20] Appellants' second personnel claim is that this regulation was violated when OJJDP, an agency with authority over its own personnel affairs, was placed in the same competitive area as LEAA.

Requiring appellants to exhaust their administrative remedies before bringing their personnel claims in federal court would fulfill the doctrine's first purpose of implementing the congressional determination that appellants and others similarly situat-

18. In submissions to this court both parties have included an arbitration opinion dated December 15, 1982 that apparently resulted from a grievance filed by one of the appellants. The grievance was evidently brought before the RIF (and this case) was instituted, and appellants thus argue that they *did* proceed in the first instance in accord with the grievance procedure. However, the doctrine we are applying requires *exhaustion*—not mere *invocation*—of administrative remedies before resort to the courts. Therefore, the fact that appellants may have begun to pursue their administrative remedy while bringing this action in court is strictly speaking irrelevant to our analysis.

In their brief submitted to this court appellees appended a copy of the arbitrator's opinion, but misinformed us by noting that the arbitration was "based on a grievance brought by one of the RIFed OJJDP employees *who is not a party to this action.*" Brief for appellees at 7 n. 7 (emphasis added). If our reading of the record is correct and the employee was in fact a party, we find such a careless misstatement of what could have been an important fact inexplicable.

19. Appellants also cite the Federal Personnel Manual, which states that the concern in defining competitive levels is "not with the qualifications an employee possesses but with the qualifications required by the duties and responsibilities of the position as stated in the official position description." Ch. 351, Subch. 2, § 2–3(a)(2) (1981).

20. The regulations add that "[a]n agency may establish a competitive area larger than one that meets [this] standard." 5 C.F.R. § 351.402(b). In support of their claim appellants also cite the Federal Personnel Manual, which states that "[t]he authority to take personnel actions is usually one factor in the extent of the competitive area," and that "[a]n agency's different activities, although located side by side, may be separate competitive areas if each is (1) under a separate administrative authority; (2) independent of the others in operation, staff, work functions, and personnel administration; and (3) separately organized and clearly distinguished from the others." Ch. 351, Subch. 2, § 2–2(b) (1981).

ed use the administrative mechanism established by statute. The provisions of the Civil Service Reform Act (CSRA), Pub.L. No. 95–454, 92 Stat. 1212 (1978), that were codified at 5 U.S.C. §§ 7101–7135 provide a comprehensive scheme for managing labor relations in the federal civil service. Congress explicitly required that collective bargaining agreements "shall provide procedures for the settlement of grievances" and mandated that these procedures shall be exclusive, 5 U.S.C. § 7121(a)(1) (1982). The statute defines a grievance as any complaint "by any employee concerning any matter relating to the employment of the employee," *id.* § 7103(a)(9)(A), or any complaint "by any employee * * * concerning * * * any claimed violation, misinterpretation, or misapplication of any law, rule, or regulation affecting conditions of employment * * *." *Id.* § 7103(a)(9)(C)(ii).[21]

Given these sweeping provisions, there can be little doubt that appellants' personnel claims represent grievances of just the kind for which Congress provided the statutory/contractual remedies embodied in the Civil Service Reform Act. As the Eighth Circuit has noted in interpreting the same provisions, "This procedural framework indicates the care taken by Congress to preserve the rights of aggrieved employees while avoiding the problems of overlapping and inconsistent jurisdiction." *Carter v. Kurzejeski,* 706 F.2d 835, 840 (8th Cir. 1983).[22] To permit appellants to bring their personnel claims to District Court would be to undercut the congressional purpose of confining such disputes to the grievance procedures that the employees' representatives have negotiated.

Moreover, requiring exhaustion of personnel claims will fulfill the other purposes of the exhaustion doctrine. It will enable the specialized bodies granted authority in the Negotiated Agreement and statute—the agency itself, a labor arbitrator, and the FLRA—to apply their expertise and develop consistent policies in dealing with federal personnel regulations and statutes. The parties will have the opportunity in the grievance proceedings to develop fully a factual record that will ultimately aid judicial review. Finally, judicial economy will be served if the parties can successfully obtain the relief they seek by pursuing their statutory/contractual remedy.

■ Appellants argue that they need not exhaust their administrative remedies because to do so would be futile. They point out that they would have to bring their grievance at an early stage to Diegelman, the very individual whose tenure in office allegedly violates the Appointments Clause and who therefore allegedly has no authority to process their grievance. They would then need the union's approval to go to arbitration,[23] and any appeal of the arbitrator's decision to the FLRA would take a good deal of time. Finally, judicial review in the Court of Appeals of an FLRA decision would be uncertain at best, given that none of appellants' claims seem to involve an unfair labor practice.[24]

**21.** The Negotiated Agreement similarly defines "grievance": "A grievance is any complaint by any employee concerning any matter relating to the employment of the employee * * * or any complaint by any employee * * * concerning the effect or interpretation, or a claim of breach, of this Agreement or concerning any claimed violation, misinterpretation, or misapplication of any law (including Title I of the Civil Service Reform Act of 1978), rule, or regulation affecting the conditions of employment." Art. XXIV, § 1 at 115, Addendum C at 2.

**22.** Moreover, Congress demonstrated its care in defining the scope of negotiated grievance procedures by defining several types of claims that it intended to keep outside the scope of the grievance procedure. *See* 5 U.S.C. § 7121(c)

(1982). The appellants' personnel claims of course do not fall within any of these exceptions.

**23.** *See* note 15 *supra* and accompanying text.

**24.** Of course, the District Court may still have jurisdiction under the general federal question statute, 28 U.S.C. § 1331 (1976), to review FLRA decisions concerning some of appellants' claims. *See Sampson v. Murray,* 415 U.S. 61, 71–72, 94 S.Ct. 937, 943–44, 39 L.Ed.2d 166 (1974); *Borrell v. Int'l Communications Agency,* 682 F.2d 981 (D.C.Cir.1982) (interpreting provision of CSRA as not withdrawing pre-existing federal question jurisdiction over constitutional claim while at the same time not creating any new private

We believe that appellants have failed to demonstrate that resort to the grievance procedure would be genuinely futile. They have failed to allege any difficulty in the first stage of the procedure (presentation of their grievance to Sylvester). Although they allege that the union has refused to take their statutory and constitutional claims to arbitration, they have failed to show that the union has refused to vigorously prosecute their grievance based on their personnel claims. *See* note 18 *supra.* And they have failed to allege any fatal defect in FLRA review. If certain stages of the grievance procedure—for instance, appeal to Diegelman—were inappropriate in this case, the exhaustion doctrine nonetheless requires appellants to take advantage of any other stages that were available before they could seek a remedy in federal court.[25] Because appellants have not invoked even those available stages of the process, we will not upset the highly articulated jurisdictional scheme of the CSRA by permitting appellants direct resort to federal court with their personnel claims.

2. *Statutory claims.* Appellants' statutory claims are based on the hypothesis that Congress intended to grant a special autonomy within the Department of Justice to OJJDP. To support their claim appellants point to the Juvenile Justice Amendments of 1980, Pub.L. No. 96–509, 94 Stat. 2750. Before these Amendments, OJJDP had been a division of LEAA. The Amendments modified Sections 5611 and 5612 of Title 42 to remove OJJDP from the aegis of LEAA and to establish OJJDP as a separate agency within the Department of Justice, on a par with LEAA.[26] Appellants urge that the way in which the RIF of March 26 was carried out, specifically including the merger of OJJDP and LEAA competitive areas and competitive levels, violated the presumed statutory autonomy that Congress intended to give OJJDP.

Therefore, according to appellants, the RIF was illegal and should be enjoined.

The District Court held that appellants should bring their statutory claim, like their personnel claims, as a grievance under the statutory/contractual grievance procedure. Appellants challenge this holding on the ground that, because "the statutory questions raised by plaintiffs are beyond the scope of the non-judicial remedies theoretically available to them, exhaustion of those remedies is not required as a condition precedent to judicial review." Brief for appellants at 32–33. In particular, they allege that the arbitrator "has no general authority to invoke public laws that conflict with the bargain between the parties." *Id.* at 32, *quoting Alexander v. Gardner-Denver Co.,* 415 U.S. 36, 53, 94 S.Ct. 1011, 1022, 39 L.Ed.2d 147 (1974). Presumably, if the arbitrator cannot "invoke" public laws, neither can Sylvester, Diegelman, or the FLRA. Therefore, appellants urge, because no decisionmaker in the grievance procedure has authority to decide cases arising under "public laws," it would be an exercise in futility to bring their statutory claims to any of these decisionmakers and to do so is thus not a prerequisite to immediate judicial relief.

■ We hold that appellants should have submitted their statutory claim in accord with the statutory/contractual grievance procedure. Congress itself evidently did not agree with appellants' argument that the grievance procedure decisionmakers should have no authority to resolve disputes touching upon matters of public law. The statute establishing the procedure is clear in defining a grievance as "any complaint * * * by any employee concerning * * * (ii) any claimed violation, misinterpretation, or misapplication of any law, rule, or regulation affecting conditions of employment." 5 U.S.C. § 7103(a)(9) (1982). As this court has pointed out, the

right of action to enforce its own provisions); *cf. Devine v. White,* 697 F.2d 421, 437–440 (D.C. Cir.1983) (discussing need for greater judicial review of arbitrators' decisions in the public sector than in the private sector).

**25.** *See* note 15 *supra.*

**26.** *See* note 6 *supra.*

role of a public sector arbitrator—let alone the other decisionmakers involved in the statutory/contractual grievance procedure at issue here—is not necessarily precisely congruent with the role of an arbitrator (like the one involved in *Gardner-Denver*) in the private sector. *See Devine v. White*, 697 F.2d 421, 435–440 (D.C.Cir.1983). In this statute Congress expressed its clear determination that a wide range of federal employee grievances—regardless whether based on "laws, rules, or regulations"— should be submitted first through the channels envisioned by the statute. To be sure, the scope of the provision may not be universal,[27] but where the statutory claim, as in this case, is virtually identical to the personnel claims presented by appellants, and where those personnel claims are precisely the kinds of claims for which Congress established the grievance procedure, there is no reason to allow appellants to circumvent the administrative process in order to have their statutory claim judicially resolved.[28]

That the statutory claim raises virtually the same issues as the personnel claims cannot be doubted. As discussed above, one of appellants' personnel claims was based on the allegation that combining OJJDP in the same competitive area as LEAA violated a regulation stating that "[t]he standard for a competitive area is that it include all or that part of an agency in which employees are assigned under a single administrative authority." 5 C.F.R. § 351.402(b). Their statutory claim—that provisions granting authority over personnel actions to the Administrator of OJJDP were violated when OJJDP was placed in the same competitive area as LEAA—raises all of the same issues. In resolving both claims the decisionmaker or tribunal will have to investigate the proper interpretation of the personnel regulations governing the definition of a competitive area, the

extent to which Congress intended to give the Administrator of OJJDP authority over administrative matters, the procedures that were in fact followed in the RIF of March 26, and the effects of grouping OJJDP and LEAA together for purposes of the RIF.

Given this virtual identity of issues, it would violate all of the purposes of the exhaustion doctrine to permit the statutory claim to be brought in federal court while remitting appellants to their administrative remedy for their personnel claims. Once again, the congressional intent to provide a fair nonjudicial grievance procedure will be advanced if the parties are required to pursue the remedies supplied by that procedure before bringing their case in federal court. The bodies involved in the grievance procedure will have the opportunity to develop consistent policy and apply their expertise in the areas in which they specialize. The administrative bodies can develop the facts, thus providing a suitable record for judicial review. Judicial economy will be served by avoiding duplicative proceedings if the parties are satisfied with the administrative results. And requiring exhaustion avoids unwanted judicial interference in the employee relations of the Executive Branch.

■ Appellants urge this court to make an exception to the exhaustion requirement in this case because they would suffer allegedly "irreparable" injury if, having lost their jobs, they are forced to resort to what would most likely be a very lengthy administrative process to vindicate their rights. The Supreme Court addressed a similar argument in *Sampson v. Murray, supra*, 415 U.S. 61, 94 S.Ct. 937, 39 L.Ed.2d 166, in which it held that loss of employment is an insufficient showing of irreparable injury to justify judicial interference by means of preliminary injunction in the sensitive area

---

27. In fact, our own holding in this case that appellants need not invoke the administrative procedure to resolve their constitutional claim demonstrates that the grievance procedure has some limits.

28. Appellants' statutory claim may in fact face a number of other hurdles. For instance, it is not clear that the strong autonomy principles that appellants urge can actually be elicited from the statutory provision (and accompanying legislative history) cited above. Our disposition of the case makes decision of these issues unnecessary.

of federal employee relations. *See id.* at 88–91, 94 S.Ct. at 951–53. In fact the plaintiff in *Sampson* presented a rather stronger case for intervention than do these plaintiffs, given that the *Sampson* plaintiff alleged that loss of her job for misfeasance would injure her reputation and subsequent employability; this is an argument that appellants here, laid off in a RIF, could hardly make. We thus follow the Supreme Court and hold that loss of employment without more is insufficient to constitute irreparable injury for purposes of making an exception to the exhaustion requirement. Nor does the alleged "programmatic injury" that the beneficiaries of OJJDP's activities would suffer suffice to show irreparable injury. Even if appellants' dire projections of harm resulting from the RIF were fully justified, their argument proves far too much: *any* government workers who unfortunately lose their jobs in a large-scale RIF would be able likewise to make allegations of severe programmatic injury and thereby avoid use of the administrative process altogether. We decline to permit litigants to use such claims of "programmatic injuries" to third parties to circumvent the carefully articulated administrative scheme for handling federal employee grievances.

### B. *Constitutional Claim*

Because the District Court held that appellants lacked standing to bring their claim under the Appointments Clause, the court apparently did not reach the issue whether exhaustion is a prerequisite to their constitutional claim. In the next section we reverse the District Court's determination with respect to the standing issue, and we therefore find it convenient to dispose of the exhaustion issue here.[29]

■ In general, the fact that appellants raise both constitutional and nonconstitutional claims does not in itself affect the application of the exhaustion doctrine. *Aircraft & Diesel Equipment Corp. v. Hirsch, supra,* 331 U.S. at 771–772, 67 S.Ct. at 1502–1503; *Wallace v. Lynn, supra,* 507 F.2d 1186; *accord American Federation of Gov't Employees v. Nimmo,* 711 F.2d 28 (4th Cir.1983); *Gaunce v. deVincentis,* 708 F.2d 1290, 1293 (7th Cir. 1983). *But cf. Hatcher v. Office of Comptroller of Currency,* 631 F.2d 985, 988 (D.C.Cir.1980) (reserving question whether judicial resolution of constitutional claim must await completion of administrative proceedings on nonconstitutional claims). Instead, just as with appellants' personnel and statutory claims, application of the exhaustion doctrine to their constitutional claim depends on an analysis of the issues in the case in light of the purposes of the doctrine.

Appellants' constitutional claim is based on the assertion that appellees Lauer and Diegelman were responsible for planning and implementing the RIF of March 26, 1982. According to appellants, the positions held by Diegelman and Lauer—Director of OJARS and Administrator of OJJDP respectively—fall within the ambit of the Appointments Clause of the Constitution, Art. II, § 2, cl. 2, and thus must be filled by individuals appointed by the President and confirmed by the Senate.[30] Ap-

29. In this section we deal only with the question whether appellants must exhaust the administrative remedies available to them in the grievance procedure before bringing their claim in court. As we discuss in the next section, the de facto officer doctrine imposes an additional "notice" requirement on appellants as a prerequisite to bringing their claim in federal court. *See* Part IV–B *infra.* This requirement is based not on the availability of an administrative remedy, but on the rather different concerns of the de facto officer doctrine, and therefore requires different analysis.

30. The Constitution provides that the President "shall nominate, and by and with the Advice and Consent of the Senate, shall appoint * * * all other Officers of the United States, whose Appointments are not herein otherwise provided for, and which shall be established by Law: but the Congress may by Law vest the Appointment of such inferior Officers, as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments." Art. II, § 2, cl. 2. The statutes establishing the posts of Director of OJARS, *see* 42 U.S.C. § 3781(a) (Supp. V 1981), and Administrator of OJJDP, *see id.* § 5611(c), provide that individuals occupy-

pellants allege that neither Lauer nor Diegelman was in fact appointed by the President or confirmed by the Senate. Therefore, appellants assert, appellees lacked authority to carry out the RIF of March 26, 1982, and they seek declaratory and injunctive relief restoring them to their jobs.

In considering the justiciability of appellants' constitutional claim, it is important first to note that the constitutional claim, unlike the personnel or statutory claims, could not have been brought in the grievance procedure. Although Congress did intend that federal employees with grievances "concerning * * * any claimed violation * * * of any law * * * affecting conditions of employment," 5 U.S.C. § 7103(a)(9)(C)(ii) (1982), should be required to use the grievance procedures mandated by the Civil Service Reform Act, neither party to this case argues that the grievance procedure is an adequate forum to resolve the constitutional claims. The Appointments Clause embodies important principles concerning the relative influence of the Legislative and Executive Branches over the carrying out of this country's laws. The decisionmakers involved in the statutory/contractual grievance procedure have neither the qualifications nor the expertise to articulate and develop these principles. As the Supreme Court has stated, "Constitutional questions obviously are unsuited to resolution in administrative hearing procedures and, therefore, access to the courts is essential to the decision of such questions." *Califano v. Sanders*, 430 U.S. 99, 109, 97 S.Ct. 980, 986, 51 L.Ed.2d 192 (1977). We therefore hold that appellants need not have submitted their constitutional claim in accord with the grievance procedures. *Cf. Borrell v. Int'l Communications Agency*, 682 F.2d 981, 989 (D.C.Cir. 1982); *Carducci v. Regan*, 714 F.2d 171, 175–176 (D.C.Cir.1983) ("[O]ur *Borrell* holding regarding the exclusivity of CSRA remedies did not extend to constitutional

claims."). Consequently, the requirement that plaintiffs exhaust administrative remedies takes on a somewhat different cast when applied to appellants' constitutional claim than it had when applied to their personnel and statutory claims. The issue is not whether appellants must submit their constitutional claim through the grievance channels before bringing that claim in federal court; instead, the issue here is whether appellants must submit their other, *non*-constitutional, claims through grievance channels before bringing their constitutional claim in federal court.

Once again, we analyze this issue in the light of the four purposes of the exhaustion doctrine. Adjudicating appellants' constitutional claim now would not do direct violence to Congress' scheme for federal employee relations because, as noted above, that scheme was not designed to deal with constitutional claims of this type. And allowing plaintiffs in some circumstances to bring their constitutional claims before completing administrative proceedings would have little tendency to encourage employees to deliberately flout the grievance proceedings by withholding their other claims from those proceedings; under our holding in this very case, the appellants, who pursued this course, run the risk of forfeiting their nonconstitutional claims because of their delay in pursuing the grievance procedure. *See* Negotiated Agreement, Art. XXIV, § 8, Step 1 at 117, Addendum C at 4 (grievance must be filed within 30 days of the event leading to the grievance).

Judicial proceedings on the constitutional claim would not forfeit the benefit of agency expertise. The bodies involved in the grievance procedure have neither authority to resolve the constitutional claim at issue here, nor expertise that would be particularly useful; resolution of constitutional questions is of course one of the tradition-

---

ing those posts shall be appointed "by the President by and with the advice and consent of the Senate." Appellants thus claim that the tenure of Diegelman and Lauer violates both constitutional and statutory provisions. Although the

Vacancies Act, 5 U.S.C. §§ 3345–3349 (1982), contains provisions for filling interim vacancies, appellants allege that Diegelman and Lauer hold office in violation of these provisions as well.

al, core functions of the judicial system. *Cf. McKart v. United States, supra,* 395 U.S. at 198–199, 89 S.Ct. at 1665.

The facts required for deciding the constitutional issue will be quite different from those bearing on the personnel and statutory issues, thus obviating the possibility of duplicative factfinding before court and agency. Proof of the constitutional claim will depend on the types of appointments that Diegelman and Lauer held, the dates (if any) they received those appointments, and the interpretation of the Appointments Clause and the statutes creating the positions of Director of OJARS and Administrator of OJJDP, 42 U.S.C. §§ 3781, 5611(a) (1982).[31] None of these factual issues has any important relationship to the questions presented by the personnel and statutory claims.[32] In the context of this case this complete divergence between the issues presented by the constitutional and personnel/statutory claims militates strongly toward not requiring appellants to exhaust the lengthy administrative remedies for their personnel/statutory claims before bringing their constitutional claims in federal court.

In fact, the only purpose behind the exhaustion doctrine that would even plausibly be served is promotion of judicial economy by avoiding possibly needless decision of constitutional questions. To be sure, this is a weighty consideration, and both the Supreme Court and this court have recognized that it plays a major role in application of the exhaustion doctrine. *See Aircraft & Diesel Equipment Corp. v. Hirsch, supra,* 331 U.S. at 774, 67 S.Ct. at 1504;

*Wallace v. Lynn, supra,* 507 F.2d at 1190; accord *American Federation of Gov't Employees v. Nimmo, supra,* 711 F.2d 28; *Gaunce v. deVincentis, supra,* 708 F.2d at 1293; *Carter v. Kurzejeski, supra,* 706 F.2d at 838–839. In *Wallace, supra,* the appellants were government employees aggrieved by suspension from their jobs; the precise nature of the constitutional claims presented by appellants is not clear from the opinion, but it seems that the general type of claim presented—whether appellants had been victims of retaliatory suspension for exercise of First Amendment rights or had been singled out for suspension because of their race—was precisely the type of claim that the grievance procedure was designed to deal with in adjudicating whether appellants had been discharged for just cause. The court noted that the bodies handling grievances could not "finally settle" the constitutional claims as a matter of constitutional law, *Wallace, supra,* 507 F.2d at 1191. But the bodies could have voided the suspensions if they had become convinced that there was no just cause for appellants' discharge. The court therefore held that appellants had to process their complaint through the grievance procedure before being permitted to bring their constitutional claim in federal court.

This case, however, diverges significantly from *Wallace.* First, the *Wallace* plaintiffs' constitutional claim and just cause discharge claims raised virtually identical issues, as noted above. In this case, in contrast, the almost complete divergence between the constitutional and nonconstitutional claims renders irrelevant most of the

---

**31.** If the District Court agrees that Lauer in fact held a constitutionally valid appointment, another factual issue will be the extent to which Diegelman, who presumably did not hold a constitutionally valid appointment, exercised authority over the planning and implementation of the RIF.

**32.** To be sure, the validity of the constitutional claim may depend in part on who instituted and controlled the decisions that resulted in the firing of appellants; this issue may to some extent in turn be influenced by the construction of 42 U.S.C. § 5612(a), the statute implicated in appellants' statutory claim that grants power to the

Administrator of OJJDP over employment decisions. Yet the precise issues that this statute raises with respect to the constitutional claim will be quite different from those implicated in appellants' statutory claim. The statutory claim would center on the question of to what extent Congress intended the grant of control over personnel matters to be a general grant of autonomy to OJJDP, while the constitutional claim involves the statute only to the extent that it is useful in determining whether improperly appointed individuals exercised authority in the RIF.

purposes underlying the exhaustion requirement. Second, the administrative process in *Wallace* was fully capable of granting full relief to appellants; avoidance of the suspension because of an administrative finding that appellants had, *e.g.*, been victims of retaliation in violation of federal personnel regulations would have been fully effective in remedying the constitutional violation premised on the same facts. In this case, on the contrary, the constitutional violation pleaded by appellants is a continuing one, and even granting relief to these appellants would not preclude the same issue arising with respect to other acts of appellees. There is thus a significant public interest in reaching a final determination as to the tenure in office of Diegelman and Lauer. Third, the *Wallace* case was premised on the existence of a fair and efficient administrative process to handle the appellants' grievances.[33] Although appellants have failed to show that resort to the grievance procedure in question here would be entirely futile, they have pointed to a number of hurdles that make the administrative procedure extremely burdensome and likely to delay judicial resolution for an extremely long time.[34] We hesitate to so burden appellants' constitutional claim, especially when an early hearing on that claim would seemingly have been assured if they had commenced an action based on it alone.

██ We therefore conclude that appellants need not exhaust administrative remedies for their nonconstitutional claims before bringing their constitutional claims in federal court. This conclusion is buttressed by recent decisions in the Supreme Court and in this court. In *Mathews v. Eldridge*, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976), the Supreme Court refused to require the plaintiff to pursue available administrative channels in which he could protest termination of Social Security disability benefits. Instead, even in the presence of a statute explicitly requiring exhaustion of administrative remedies as a prerequisite to District Court jurisdiction, the Supreme Court permitted the plaintiff to bring a procedural due process challenge in District Court to the procedures used for terminating disability benefits. As in this case, the plaintiff could not have pressed his constitutional challenge through the administrative process but, as in this case, the administrative process could have remedied his nonconstitutional claim. In this context, the Court refused to apply the exhaustion doctrine.

Similarly, our cases have held that plaintiffs may sometimes present their constitutional claims in federal court even if they have failed to exhaust administrative remedies on nonconstitutional claims. For instance, in *Committee for GI Rights v. Callaway, supra*, 518 F.2d 466, we did not require exhaustion when to do so would "merely delay a decision by the federal courts," *id.* at 474, given the fact that the administrative body was obviously incapable of adequately adjudicating the constitutional claim. In the instant case, in which the constitutional question is clear and depends on facts almost entirely unrelated to the facts upon which the nonconstitutional claims are based, and in which appellants face an extremely long and burdensome administrative remedy, we hold that the exhaustion doctrine ought not be applied.

IV. JUSTICIABILITY OF THE CONSTITUTIONAL CLAIMS

Although appellants need not exhaust their administrative remedies before bringing their constitutional claim in District Court, several hurdles nonetheless may remain to District Court decision on the constitutional claim. Among these are the standing doctrine, which the District Court found to be dispositive in this case; the "de facto officer" doctrine, which limits plain-

---

33. In *Wallace* there were in fact two alternative processes for handling their grievances, thus contributing to the court's conclusion that "[i]nitiation and pursuit of the administrative process does not appear particularly burdensome, and in the usual case need not long delay judicial resolution, if necessary." 507 F.2d at 1191.

34. *See* text accompanying note 15 *supra*.

tiffs' ability to challenge governmental action on the ground that the officers taking that action are improperly in office; and appellees' contention that appellants' constitutional claim here is insubstantial. We find the District Court's resolution of the standing issue to be clearly incorrect, and reverse on that ground. Moreover, we hold that appellants may have brought their challenge within the narrow confines permitted by the de facto officer doctrine, and the District Court on remand should engage in further factfinding to resolve the issue. Finally, appellees are mistaken in urging us to resolve factual issues concerning who was responsible for the RIF of March 26 and whether the authority that individual exercised was constitutionally valid. Appellees' contentions are more properly presented to the trier of fact in this case; we cannot usurp the trial court's function and decide these factual issues on the record presented to us here.

## A. *Standing*

In a brief footnote in its opinion the District Court held that appellants do not have standing to raise their constitutional claims. *See* Dist.Ct.Op. at 2 n. 3, App. 118. The court seems to have believed that appellants do not have standing because (a) they have suffered no particularized injury, as required by such cases as *Schlesinger v. Reservists Committee to Stop the War*, 418 U.S. 208, 94 S.Ct. 2925, 41 L.Ed.2d 706 (1974), and (b) at any rate, the improper tenure in office of appellees Lauer and Diegelman did not cause their injury, a proposition for which the District Court cited *Duke Power Co. v. Carolina Environmental Study Group, Inc.*, 438 U.S. 59, 98 S.Ct. 2620, 57 L.Ed.2d 595 (1978). In this section we hold that the District Court's analysis of the standing issue was mistaken; appellants' loss of their jobs constituted sufficiently particularized injury to provide them with standing to sue in federal court under constitutional and prudential standing doctrines. In addition, we hold that there was a sufficient causal connection between their grievance (appellees' alleged lack of authority because of their

improper appointment) and the injury suffered (their improper firing from their jobs) to easily support their standing to raise their constitutional claim.

1. *Injury in fact.* The concept of injury in fact was first introduced as an explicit part of standing doctrine in *Ass'n of Data Processing Service Org., Inc. v. Camp*, 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970), and *Barlow v. Collins*, 397 U.S. 159, 90 S.Ct. 832, 25 L.Ed.2d 192 (1970). As the doctrine developed during the 1970's, the requirement referred to the need for a plaintiff to "show that he personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant." *Gladstone, Realtors v. Village of Bellwood*, 441 U.S. 91, 99, 99 S.Ct. 1601, 1607, 60 L.Ed.2d 66 (1979). The purpose of this part of the standing requirement is to give the plaintiff a "personal stake in the outcome," *Baker v. Carr*, 369 U.S. 186, 204, 82 S.Ct. 691, 703, 7 L.Ed.2d 663 (1962), sufficient to ensure "that the issues will be contested with the necessary adverseness and that the litigation will be pursued with the necessary vigor to assure that the constitutional challenge will be made in a form traditionally thought to be capable of judicial resolution." *Flast v. Cohen*, 392 U.S. 83, 106, 88 S.Ct. 1942, 1955, 20 L.Ed.2d 947 (1968). A corollary to this principle is that the plaintiff must have suffered a "distinct and palpable injury to himself," *Warth v. Seldin*, 422 U.S. 490, 501, 95 S.Ct. 2197, 2206, 45 L.Ed.2d 343 (1975), rather than one "shared in substantially equal measure by all or a large class of citizens." *Id.* at 499, 95 S.Ct. at 2205.

Under these principles, it is clear that appellants in this case suffered a classic "direct," "concrete," and "particularized" injury: they lost their jobs. *See Williams v. Phillips*, 482 F.2d 669, 671 n. 3 (D.C.Cir.1973) (standing of employees in similar situation "rests on firm ground"). This clearly distinguishes them from the plaintiffs in *Schlesinger*, who had merely a generalized citizens' interest in seeing to it that, in accord with the Incompatibility

Clause of the Constitution, Art. I, § 6, cl. 2, no member of Congress could serve as a Reserve officer during his term in office, or the plaintiff in *Sierra Club v. Morton*, 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972), which challenged the legality of Interior Department approval of a resort complex without asserting that the plaintiff or its members would use the area in which the complex would be built. In fact, the Supreme Court has recognized standing in cases in which the plaintiffs asserted far more generalized injuries than did the plaintiffs here. *See, e.g., United States v. SCRAP*, 412 U.S. 669, 678, 93 S.Ct. 2405, 2411, 37 L.Ed.2d 254 (1973) (plaintiffs injured by having to breathe polluted air and use environmentally damaged forests and rivers). Thus, as long as the plaintiff can assert, as appellants did here, that they have "sustained or [are] immediately in danger of sustaining a direct injury," *Ex parte Levitt*, 302 U.S. 633, 634, 58 S.Ct. 1, 2, 82 L.Ed. 493 (1937), they have met the requirement of this first part of the standing doctrine.

2. *Causation.* In the same case in which the Supreme Court replaced "legal injury" with "injury in fact" for purposes of the standing inquiry, it also introduced a causation requirement. *See Ass'n of Data Processing Service Org., Inc. v. Camp*, *supra*, 397 U.S. at 152, 90 S.Ct. at 829. In *Warth v. Seldin, supra*, 422 U.S. at 504–507, 95 S.Ct. at 2207–2209, and *Simon v. Eastern Kentucky Welfare Rights Organization (EKWRO)*, 426 U.S. 26, 42–45, 96 S.Ct. 1917, 1926–27, 48 L.Ed.2d 450 (1976), the Court developed the causation test into a two-pronged inquiry. First, the plaintiff's injuries had to be a result of defendant's actions. *Warth*, 422 U.S. at 504–507, 95 S.Ct. at 2207–9. Second, the relief sought had to be likely to cure the injury. *EKWRO*, 426 U.S. at 43–45, 96 S.Ct. at 1926–1927. Only if these causation requirements were met would the plaintiff have the personal stake required by current standing doctrine.

Appellants in this case meet both causation requirements. In their constitutional claim appellants alleged that they would be improperly deprived of their jobs because Diegelman and Lauer had no constitutional authority to carry out the RIF they had planned. This claim displays the same structure as most claims in which plaintiffs object to the *manner* in which government has taken action against them. They do not deny that they could be fired under some circumstances, but rather object to their having been fired by government officials who were constitutionally disqualified from exercising power over them. Therefore, the injury they claim— that of having been improperly deprived of their jobs—was a result of the constitutional infirmity to which they object. Moreover, if the appellants are granted the relief they seek—a declaration and injunction against Diegelman and Lauer improperly exercising the powers of office against them—their injury will be redressed.

The government argues that appellants lack standing because "[t]here has been no factual assertion that if Messrs. Diegelman or Lauer had been nominated by the President or confirmed by the Senate, the RIF action would have been carried out any differently." Brief for appellees at 34. The government's argument here asks precisely the wrong question. The causation inquiry cannot be addressed to the question whether the appellants would have lost their jobs if the President had appointed and the Senate had confirmed Diegelman and Lauer, for the purpose of the Appointments Clause is precisely to grant some control over the Executive Branch to Congress, within the framework of the system of checks and balances put in place by the Constitution. The clause would be a nullity if it could be assumed that these very officials *would* in fact have been properly appointed and (especially) confirmed by the Senate.[35]

---

**35.** We note that the Appointments Clause permits the Senate to exercise influence not only by refusing to confirm appointees—a course it re-

serves only for unusually serious cases—but also by extracting concessions or promises concerning future policy in the course of confirma-

Finally, the government's argument would result in findings of lack of standing in most cases in which challenges are made to the way in which the government has taken an action of the kind that it concededly has the right to take. The government in effect suggests that plaintiffs in, for example, procedural due process cases do not have standing unless they can show that, if the government had operated in accord with constitutionally valid procedures, it would not have taken adverse action against them. Of course, plaintiffs in such cases can rarely or never make such a showing; the gravamen of their charge is usually that they have a right that the government act in accord with due process principles when it takes action against them, even if such conformance may not change the substantive outcome. Causation is in fact present in these cases because it cannot be assumed that action in accord with the correct procedures would have produced the same result.

### B. *The De Facto Officer Doctrine*

At oral argument appellees cited *Nat'l Ass'n of Greeting Card Publishers v. U.S. Postal Service*, 569 F.2d 570 (D.C.Cir.1976) (*per curiam*), *vacated and remanded on other grounds*, 434 U.S. 884, 98 S.Ct. 253, 54 L.Ed.2d 169 (1977), for the proposition that plaintiffs may not challenge the actions of government officials on the ground that their appointments are invalid. In *Greeting Card* the statute required that no more than three members of the five-member Postal Rate Commission be adherents of the same political party. Plaintiffs, alleging that the three Republican members and the one Conservative member should be treated as belonging to the same party, challenged the higher rates that this allegedly improperly constituted Commission had approved. The opinion of the panel held that the Republican and Con-

servative parties, even if philosophically similar, were separate and independent. *Id.* at 579. Having disposed of the case in this way, the court went on to note that, even if the Commission were improperly composed, its actions would still retain validity. Quoting *United States ex rel. Doss v. Lindsley*, 148 F.2d 22, 23 (7th Cir.), *cert. denied*, 325 U.S. 835, 65 S.Ct. 1202, 89 L.Ed. 1962 (1945), the court said that "[a] person actually performing the duties of an office under color of title is an officer de facto, and his acts as such officer are valid so far as the public or third parties who have an interest in them are concerned." *Greeting Card*, 569 F.2d at 579; *see also Ex parte Ward*, 173 U.S. 452, 19 S.Ct. 459, 43 L.Ed. 765 (1899). The court went on to insist that "the remedy for improper composition is not invalidation of the Commission's action through indirect challenge, but rather removal of the allegedly disqualified Commissioner by way of direct attack." *Greeting Card*, 569 F.2d at 579.

 The doctrine that the court mentioned in *Greeting Card* is a doctrine with feudal origins. It distinguishes between "collateral" attacks, in which plaintiffs attack government action on the ground that the officials who took the action were improperly in office, and "direct" attacks, in which plaintiffs attack the qualifications of the officer, rather than the actions taken by the officer. The doctrine holds that collateral attacks pose too great a threat that the attacked officials' past actions would be subject to wholesale invalidation, which would interfere with the government's ability to take effective action and with third parties' reliance on apparently final government actions. Instead, only direct attacks—which, as explained below, may often be impossible due to a lack of standing or other restrictions—on officers' titles to their offices are permissible. In prohibiting suits attacking government ac-

---

tion hearings. In this very case Congress had repeatedly acted to protect OJJDP and its programs, *see, e.g.,* Juvenile Justice Amendments of 1980, § 6, Pub.L. No. 96–509, 94 STAT. 2750, 2752, and might well have used the opportunity of confirmation hearings to further this pur-

pose. The point is that the Appointments Clause forbids us from assuming that Congress would *not* have so acted if it had had the opportunity to pass on the appointments of Diegelman and Lauer.

tions on the ground that the officials taking the actions invalidly hold office, the doctrine gives no weight to the public interest in enforcing legal norms concerning eligibility and appointment to office and individuals' interests in having the government act against them only through lawfully appointed agents.

The failure to recognize these important interests is apparent when the restrictions of the de facto officer doctrine are considered in combination with the law of standing. While the law of standing requires that plaintiffs sustain actual injury before they can bring an action, the de facto officer doctrine would deny them a remedy—or even a forum—if they seek to gain redress of injuries already suffered. For instance, if appellants here brought suit before the government took action against them, they would likely be held to lack standing; their position would be similar to that of the 21 nonfired appellants in this case. If appellants brought suit after action is taken against them, they would run afoul of the de facto officer doctrine and would be told that they may not challenge the validity of appellees' appointments.

The brief *Greeting Card* discussion represents the only treatment of the de facto officer doctrine by this court since at least 1945.[36] *See United States ex rel. Noel v. Carmody*, 148 F.2d 684 (D.C.Cir.1945). *But cf. Williams v. Phillips*, 482 F.2d 669, 671 n. 3 (D.C.Cir.1973) (*per curiam*) (standing of government employees to bring action challenging validity of appointment of head of agency "rests on firm

ground"). The *Greeting Card* court supported its discussion with citation to a series of cases in which courts refused to hear challenges to the composition of draft boards by defendants who had refused induction into the armed services. *Greeting Card*, 569 F.2d at 579. Although these cases did represent the majority opinion in the late 1960's and early 1970's, *see* Annot., 11 A.L.R.Fed. 368, 391–405 (1970) (discussing cases in which draftees challenged composition of draft boards), the courts were by no means unanimous; some cases held that this kind of "indirect challenge" was permissible, *see, e.g., United States v. Williams*, 317 F.Supp. 1363, 1367–1370 (E.D. Pa.1970), and this circuit never took a position on the issue.[37]

Applying the de facto officer doctrine would likely leave plaintiffs seeking to challenge the regularity (and, even more important, the constitutionality) of the appointment of government officers without any remedy at all and would thus render the legal norms under which appellants are proceeding unenforceable. Courts that bother to explicate the meaning of "direct" attack for purposes of the de facto officer doctrine usually state that the "direct" attack which the doctrine provides as the exclusive remedy is a *quo warranto* action. *See, e.g., Greeting Card*, 569 F.2d at 579 n. 24; *Czepil v. Hershey*, 425 F.2d 251, 252 (7th Cir.), *cert. denied*, 400 U.S. 849, 91 S.Ct. 44, 27 L.Ed.2d 87 (1970); *Barrett v. Craven County Board of Education*, 70 F.R.D. 466, 482–483 (E.D.N.C.1976). *Quo warranto* actions in federal courts seem to

---

**36.** It should be noted that the case law in general is at best spotty and ambiguous concerning the scope and current vitality of the doctrine. The *Greeting Card* case is the only recent case in which this court has mentioned the doctrine. In that case the brief two-paragraph discussion, *see Greeting Card*, 569 F.2d at 579, came after the court had already disposed of the issue on other grounds. The discussion included a puzzling comment that "direct attack" is the appropriate means of challenging allegedly disqualified officials, coupled with a footnote that cited cases suggesting that such a direct attack (by means of an action in *quo warranto*) is an inadequate remedy. *Id.* at 579 n. 24. Clearly, in the complex *Greeting Card* case in which the

disqualification issue played a very minor role and in which the challenge to the officials' qualifications had little or no merit, the court did not concentrate its attention on the de facto officer doctrine.

**37.** In a footnote in the *Greeting Card* opinion this court suggested that *Williams* may have been correct, and that such allegedly "indirect" challenges may have been permissible. *Greeting Card*, 569 F.2d at 579 n. 25. If *Williams* was correct, the cases on which the court relied for its interpretation of the doctrine would necessarily be incorrect.

be governed by the provisions of 16 D.C. Code §§ 3501–3548 (1981), *see Newman v. United States ex rel. Frizzell,* 238 U.S. 537, 551–552, 35 S.Ct. 881, 885, 59 L.Ed. 1446 (1915) (discussing predecessor of current statute); *Application of James,* 241 F.Supp. 858 (S.D.N.Y.1965). Yet these provisions place a series of obstacles in the path of any plaintiff. A plaintiff must first apply to the Attorney General or the United States Attorney to bring the action on his behalf in the District Court for the District of Columbia, *see* 16 D.C.Code §§ 3501–3502, and these officials have broad discretion—especially in cases involving public officials, as opposed to corporate officers—to refuse to sue, *see United States ex rel. Noel v. Carmody, supra,* 148 F.2d at 685; *Application of James, supra,* 241 F.Supp. at 860. If they refuse to act, an "interested person" may petition the court for leave to have the writ issued in his own name, 16 D.C.Code § 3503, but the court, too, has broad discretion to deny the writ, *see Columbian Cat Fanciers, Inc. v. Koehne,* 96 F.2d 529, 532 (D.C.Cir.1938). Moreover, this court has stated that actions against public officials (as opposed to actions brought against officers of private corporations) can *only* be instituted by the Attorney General. *See United States ex rel. Noel v. Carmody, supra,* 148 F.2d at 685.

▪ The above procedure is cumbersome and could easily operate to deprive a plaintiff with an otherwise legitimate claim of the opportunity to have his case heard. For instance, the Attorney General was responsible for appointing appellees Diegelman and Lauer to their jobs. Requiring appellants to convince the Attorney General to file a *quo warranto* action on their behalf in this case would effectively bar their access to court. If appellants attempted to petition the court for leave to have the writ issued under 16 D.C.Code § 3503, they would face the difficult task of persuading the court that they were "interested persons." In feudal times, when the writ of *quo warranto* originated,

public offices were similar to a form of property right, and a *quo warranto* action was like an action of ejectment, in which the only party who could bring a lawsuit was a claimant who sued to regain possession from one who was unlawfully in possession. Some courts have continued to insist that only a claimant to the defendant's office is sufficiently "interested" to bring a *quo warranto* action. *See Columbian Cat Fanciers, Inc. v. Koehne, supra,* 96 F.2d at 532; *Application of James, supra,* 241 F.Supp. at 859; *cf. Newman v. United States ex rel. Frizzell, supra,* 238 U.S. at 544, 35 S.Ct. at 882 (*quo warranto* "came to be used as a means of determining which of two claimants was entitled to an office"). *But cf. id.* at 551, 35 S.Ct. at 885 (recognizing that "there might be cases under the civil service law in which the relator would have an interest and therefore a right to be heard"); *United States ex rel. Noel v. Carmody, supra,* 148 F.2d at 684–685 (in cases involving private corporations stockholder can bring *quo warranto* action against corporate officer even if stockholder himself does not claim office; distinguishing cases involving public officials).

▪ Given these restrictions, *quo warranto* is an extremely difficult and uncertain remedy for the type of claim at issue in this case. This court has held that equity will not be barred from issuing an injunction to restrain invalidly appointed officers if the alternative remedy of *quo warranto* is inadequate. *Columbian Cat Fanciers, Inc. v. Koehne, supra,* 96 F.2d at 532. Although that case involved a private corporation rather than public officers, it suggests the appropriate course to follow in this case: the court should avoid an interpretation of the de facto officer doctrine that would likely make it impossible for these plaintiffs to bring their assumedly substantial constitutional claim and would render legal norms concerning appointment and eligibility to hold office unenforceable.[38]

---

**38.** In some respects the problems with *quo war-* *ranto* as a remedy in this type of situation are

With the above considerations in mind, we hold that appellants' action here was not necessarily barred by the de facto officer doctrine,[39] for the purposes of the doctrine can be served without causing the above unfortunate results. The core purposes of the doctrine are served if a plaintiff challenging government action on the ground that the officials taking that action improperly hold office meets two requirements. First, the plaintiff must bring his action at or around the time that the challenged government action is taken. Second, the plaintiff must show that the agency or department involved has had reasonable notice under all the circumstances of the claimed defect in the official's title to office. This does not require that the plaintiff perform any particular rituals before bringing suit, nor does it mandate that the agency's knowledge of the alleged defect must come from the plaintiff. It does, however, require that the agency or department involved actually knows of the claimed defect.

These two requirements adequately protect citizens' reliance on past government actions and the government's ability to take effective and final action—the two interests served by the de facto officer doctrine. Prohibiting attacks on government actions taken long before suit was filed protects those who have relied on those actions and avoids the chaos that might ensue if all of the actions taken by an official improperly in office for years were subject to invalidation. Requiring that the government have actual knowledge of the defect claimed protects the government's ability to take effective and final action by enabling it to remedy any defects (especially narrowly technical defects) either before it permits invalidly appointed officials to act or shortly thereafter. Yet, while the two requirements protect the interests underlying the de facto officer doctrine, they do so without unduly interfering with other important interests that are equally worthy of protection: individuals' interests in having legal process available to redress specific legitimate claims and the public interest in enforcing legal norms governing appointment and eligibility to hold public office and exercise the powers of the state.

the same problems raised by the combination of the de facto officer doctrine and the law of standing. If appellants bring suit before being discharged, they are denied a forum because they are not "interested persons" under 16 D.C. Code § 3501. If they bring suit after their firing, the extreme form of the de facto officer doctrine would be a bar.

**39.** Adjudicating a challenge to an action taken by a government official on the ground that the official invalidly holds office has substantial support in the case law. Both the Supreme Court and lower federal courts have adjudicated challenges in a number of cases that would have been barred by the traditional form of the de facto officer doctrine. *See, e.g., Mayor of Philadelphia v. Educational Equality League,* 415 U.S. 605, 94 S.Ct. 1323, 39 L.Ed.2d 630 (1974) (challenge to appointment of Nominating Panel for Philadelphia School Board, in which plaintiffs sought to have actions taken by panel overturned); *Glidden Co. v. Zdanok,* 370 U.S. 530, 82 S.Ct. 1459, 8 L.Ed.2d 671 (1962) (adjudicating challenge to conviction on ground that the judge allegedly did not hold office validly under Article III of the Constitution); *United States v. Woodley,* 726 F.2d 1328 (9th Cir.1983) (adjudicating challenge to sentence on ground that

recess appointment of judge was invalid); *Horn v. United States,* 671 F.2d 1328, 1331 (Ct.Cl.1982) (adjudicating challenge to Army officer's failure to get promotion on ground that review board included ineligible officers); *cf. United States v. L.A. Tucker Truck Lines, Inc.,* 344 U.S. 33, 38, 73 S.Ct. 67, 69, 97 L.Ed. 54 (1952) (defect in hearing examiner's appointment would invalidate a resulting order if objection were made at time of hearing).

Although *Buckley v. Valeo,* 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976) (*per curiam*), presents a somewhat confusing situation in this regard, the Supreme Court there too adjudicated a challenge under the Appointments Clause to the constitutional propriety of the tenure in office of members of the Federal Election Commission. The Court's discussion of remedies in *Buckley* did advert to the need, on prudential grounds, to avoid interfering with past actions of the Commission. *See id.* at 142–143. However, the Court's discussion gives no indication that this was a matter of anything other than ordinary remedial discretion in a case involving reform of an entire institution; the relief is granted with no discussion of the de facto officer doctrine and no discussion of the hurdles that the doctrine might have placed in the way of the *Buckley* plaintiffs.

In this case appellants have clearly met the first requirement stated above. They brought their action on March 25, 1982, one day before the action under attack, and they sought declaratory and injunctive relief for the specific upcoming RIF as it affected them—not wholesale invalidation of actions taken by Diegelman and Lauer. With regard to the second requirement, the District Court on remand will have to determine whether and when the agencies involved knew of the alleged defect in Diegelman's and Lauer's title to office. Appellants state that they notified the Acting General Counsel of OJARS of their claim of invalid appointment within the month preceding filing of this suit. *See* Affidavit of Mona Lyons, supplemental brief for appellants at 38. The District Court should resolve any factual disputes in order to determine whether reasonable notice under all the circumstances was given. Among the factors that the District Court should consider are:

Was notice given to an appropriate official in the agency?

Did plaintiffs give notice within a reasonable time after they knew that an invalid action had been or was going to be taken?

Did the alleged notice state with reasonable specificity the claimed defect in title?

Did the alleged notice give the agency a reasonable opportunity under all the circumstances either to avoid acting illegally or to correct its illegal action shortly after it was taken?

The District Court should bear in mind that the requirement is one of actual notice; even if appellants themselves inadequately notified the agencies of the claimed defect in title, appellants should have the opportunity to show that the agency had gained actual knowledge of the claimed defect through some other means.

We therefore hold that, if the facts indicate that this "actual notice" requirement was met, appellants are not precluded by the de facto officer doctrine from having their nonfrivolous claims heard in federal court. The doctrine would no doubt prevent plaintiffs from launching wholesale attacks on the actions of de facto officers, from attacking even particular past actions of de facto officers long after they were taken, or from attacking any actions of de facto officers if the appropriate agency or department is not on notice of the defect claimed. The doctrine also counsels that great care be taken in granting relief to plaintiffs who succeed in attacking specific actions taken by government officials on the ground that the officials have no legal title to their office; in such circumstances a court must pay due attention to equitable factors, such as the reliance of "innocent" third parties on apparently valid government action. But, taking these limitations into account, the doctrine does not prevent a specific, focused attack on an action taken by a de facto officer if the plaintiffs bring their suit at or around the time the action is taken and if the government has reasonable notice under all the circumstances of the defect claimed.

## C. *Factual Disputes*

Appellees also urge this court to affirm the District Court's dismissal of appellants' constitutional claims on the ground that Lauer, who had statutory authority over personnel actions taken by OJJDP, had in fact been validly appointed. According to appellees, the Attorney General had appointed Lauer to the post of Deputy Administrator of OJJDP, a position that required neither presidential nomination nor Senate confirmation. *See* 42 U.S.C. § 5611(e) (Supp. V 1981). The Deputy Administrator has authority under 42 U.S.C.A. § 5611(e) (1983) to "act as Administrator * * * in the event of a vacancy in the office of the Administrator." [40] Appellees

**40.** Before the passage of the Juvenile Justice Amendments of 1980, Pub.L. No. 96–509, 94 STAT. 2750, 2752, OJJDP was a part of LEAA. *See* note 7 *supra.* At that time OJJDP was under the authority of an "Assistant Administrator," who in turn functioned under the authority of the Administrator of LEAA. *See* 42 U.S.C. § 5611(d) (1976). The statute provided that

argue that Lauer therefore had the authority to carry out the RIF of March 26, that Lauer—and not Diegelman—in fact was the official responsible for the RIF, and that consequently appellants' constitutional claim is without merit.

Appellees' arguments here raise significant factual questions that would be inappropriate for this court to resolve while ruling on this appeal. First, appellants claim that Lauer was not appointed to the post of Deputy Administrator of OJJDP, but was instead appointed to be Acting Administrator of OJJDP. They additionally claim that, at any rate, any appointment Lauer may have had as Deputy Administrator had not taken effect as of March 26, 1982, when the RIF here in question was to occur. Finally, appellants claim that Diegelman was in full charge of planning and implementing the RIF of March 26. Therefore, appellants suggest that, even if Lauer held a valid appointment at the time of the RIF, Diegelman's status—and not Lauer's —should determine the validity of the RIF.

These issues seem to have been genuinely disputed since the time that appellants filed this action, and the record contains data that may support at least some of appellants' claims. Because the dispute thus seems genuine, this court may not act as a trier of fact to determine whose account of Lauer's appointment is correct.[11] Instead, on remand the District Court must

determine (1) whether Lauer and Diegelman in fact held valid appointments at the time of the March 26 RIF, and (2) whether, even if Lauer was validly appointed, Diegelman was nonetheless responsible for the RIF of March 26.

## IV. Conclusion

For the reasons stated above, we affirm the District Court's dismissal of the 21 nonfired appellants. We also affirm the District Court's dismissal of the personnel and statutory claims presented by the remaining seven appellants. However, we reverse the District Court with respect to the constitutional claim presented by the remaining seven appellants.[12] As has been evident, a constitutional claim of this kind is subject to a number of restrictions. In this case the seven appellants seemingly have met the requirements imposed by the ripeness, exhaustion, and standing doctrines. If the District Court on remand determines that they have met the requirements of the de facto officer doctrine as well, the court must go on to reach the merits of their constitutional claim.

*Affirmed in part and reversed and remanded in part.*

there shall be a "Deputy Assistant Administrator," who "shall act as Assistant Administrator * * * in the event of a vacancy in the office of the Assistant Administrator." 42 U.S.C. § 5611(e) (1976). When the 1980 Amendments gave OJJDP its own Administrator, they thereby eliminated the post of Assistant Administrator and Deputy Assistant Administrator. Pub.L. No. 96–509, § 6(b)(3), 94 STAT. 2752. Therefore, there is now a Deputy Administrator, who is authorized by the 1980 Amendments to fill the office of Administrator in the event of a vacancy, rather than the now-extinct office of Assistant Administrator. We recount this somewhat tedious history because the codifiers of our edition of the United States Code seem to have gotten it wrong in their 1981 Supplement. *Compare* 42 U.S.C.A. § 5611(e) (1983) (correct codification of 1980 amendments) *with* 42 U.S.C. § 5611(e) (Supp. V 1981) (incorrect codification of 1980 amendments).

**41.** In ruling on this appeal this court has not considered the materials concerning Lauer's appointment submitted by the parties to "supplement" the record after oral argument. The materials should instead be submitted to the District Court on remand in this case, because the factual disputes must be resolved in the District Court.

**42.** An eighth individual who was dismissed from his position at OJJDP moved in District Court to be joined as an additional plaintiff in this case. Given its dismissal of the entire case, the District Court found it unnecessary to rule on this motion. On remand the District Court should apply ordinary standards to determine whether the motion should be granted.