**UNITED STATES of America, Plaintiff,**

v.

**Dale L. BISSON, Defendant.**

**Civ. No. 85–3017.**

United States District Court, D. South Dakota, C.D.

Aug. 27, 1986.

---

Mikal Hanson, Asst. U.S. Atty., Pierre, S.D., for plaintiff.

Charles Poches, Jr., Poches & Lee, Fort Pierre, S.D., for defendant.

## MEMORANDUM OPINION

DONALD J. PORTER, Chief Judge.

### INTRODUCTION

This is an action by the United States to recover the balance due on an outstanding Commodity Credit Corporation (CCC) farm storage loan and for unearned farm storage payments. Bisson concedes that the loan was made and has not been fully repaid. He asserts as a defense, however, a provision of the loan agreement which provides that the CCC will "assume" any loss of commodities mortgaged to the CCC if the loss is not the producer's fault. Bisson also disputes the amount of unearned storage payments which must be repaid.

In addition to seeking forgiveness of the loan, Bisson has counterclaimed for insurance proceeds which he claims are due him pursuant to the terms of the contract. The government contends that Bisson is not entitled to the benefit of the "forgiveness" provision of the agreement because he has failed to exhaust his administrative remedies. The government also denies that the loss assumption provision of the contract provides insurance beyond that necessary to forgive the producer's outstanding debt.

Because Bisson failed to take all the appeals provided for by the regulations governing the ASCS and CCC crop loan program, he failed to exhaust his administrative remedies. Failure to exhaust his administrative remedies precludes Bisson from asserting his affirmative defense and counterclaim in this court. Bisson's objection to the amount claimed by the CCC as unearned storage payments is rejected for the same reason.

### FACTS

#### CCC Farm Storage Loans

The Commodity Credit Corporation (CCC) is a corporation wholly owned by United States. 15 U.S.C. § 714e. It was created by Congress "for the purpose of stabilizing, supporting and protecting farm income and prices...." *Id.* at § 714. In order to fulfill its stated purpose, the CCC provides price support payments and crop loans. *Id.* at § 714c; 7 CFR Chpt. XIV. CCC loan programs are administered by the Agricultural Stabilization and Conservation Services, (ASCS), an agency of the United States Department of Agriculture. 7 CFR § 1421.2(a).

One form of CCC crop loan is the farm storage loan program. In order to qualify, the producer certifies that he possesses, in approved storage, a certain amount of a named commodity available to be mortgaged to the CCC. *Id.* at § 1421.17. CCC then makes a loan to the producer, payable

in 9 months, based on a stated price per bushel and a percentage of the quantity which the producer certifies is in storage. TT 16, 18; Ex. 2.

Once the loan matures, the producer has 3 options. He may repay the loan, deliver the grain to the CCC or enter the farm storage grain reserve program. TT 16. The farm storage grain reserve program allows the producer to extend the due date of his loan an additional 3 years. Ex. 4. This extension is interest free. *Id.* Storage payments are made in advance on an annual basis. *Id.*

The producer must keep the commodity in storage for the duration of the loan or until the price of the commodity reaches a stated percentage of the national average loan rate.[1] *Id.* When and if the price of the commodity reaches that percentage denominated as the "release level," then the producer *may* sell the commodity and repay the loan. *Id.* If the price of the commodity remains at or above the release level for a sufficient period of time, and CCC gives the proper notice, then the producer is no longer entitled to storage payments and is generally obligated to repay unearned storage payments already advanced by the CCC. *Id.*

If the price of the commodity increases further and reaches the "call level", then the producer *must* repay the loan within the time specified or make arrangements to have the commodity delivered to the CCC. *Id.* If the loan is not repaid by the date specified by the CCC, then the producer becomes liable for interest on the loan beginning on the date set by the CCC. *Id.*

*Lost Quantity*

The producer may be entitled to "forgiveness" of all or part of the loan if the mortgaged commodity is lost or damaged through no fault of the producer. Ex. 2. In order to qualify, the producer must satisfy the CCC that the loss was not his fault, that it was solely the result of some external cause, that he reported it promptly and that his initial loan application was not fraudulent. *Id.*

*Appeal Procedure*

If the producer believes he is entitled to "forgiveness" of his loan, he must first make his case to the county ASCS committee. 7 CFR § 1421.2(a). If the committee finds against the producer, he may request reconsideration. 7 CFR § 780.3. Should the county committee still rule against forgiveness on reconsideration, then the producer is entitled to appeal to the state ASCS committee. *Id.* at § 780.4. If the producer is dissatisfied with the state committee's decision, then he may appeal to the Deputy Administrator, State and County Operations, ASCS, in Washington, D.C. *Id.* at § 780.5; 780.2(a), 719.2(i).

*The Bisson Loan*

On December 7, 1979, Dale L. Bisson entered into a farm storage loan agreement with the CCC. Ex. 2. Bisson certified to the CCC that he had an estimated 70,000 bushels of corn stored in a quonset on his farm. Ex. 1. He was given a loan on 63,000 bushels, which is 90% of the certified quantity, 7 CFR § 1421.17(a)(1), at a rate of $1.88 per bushel. Ex. 2. On January 25, 1980, an additional disbursement of 10 cents per bushel was made. *Id.* The total amount loaned to Bisson was $124,740. *Id.* The interest rate was 9%. *Id.*

On July 7, 1980, Bisson signed a farm storage grain reserve agreement. Ex. 4. The agreement provided for an interest-free extension of Bisson's loan, and storage payments by the CCC to Bisson of 26½ cents per bushel.[2] *Id.* The first year's storage payment was made in advance.

CCC advised Bisson, by a letter dated July 16, 1980, that the price of corn had reached the release level and thus he was permitted to sell some or all of the mortgaged commodity. Ex. 5. Bisson then be-

---

**1.** The producer must pay a penalty if he removes the commodity early. Ex. 4.

**2.** The actual amount advanced to Bisson was slightly more than 26½ cents per bushel. Bis-son was paid for one full year plus the days remaining in the month in which the agreement was signed. TT 73.

gan selling the corn to various purchasers. *See e.g.* Ex. 6. By letter dated November 7, 1980, CCC advised Bisson that the price of the commodity had remained at or above the release level and therefore storage payments would discontinue effective November 1, 1980. Ex. 8.

On January 16, 1981, Bisson was advised that the price of corn had reached the "call level" and thus repayment was due on April 15, 1981. Ex. 9. The due date was later extended to May 15, 1981, but 15.25% interest began accruing on the outstanding balance on April 16. Ex. 10.

Bisson made several sales of the mortgaged corn and applied the proceeds to his loan.[3] *See* Ex. 11, 12, 13, 15 and 16. One of the purchasers was a local farmer, Wesley Yost. TT 100–101.

By letter dated June 19, 1981, Bisson was notified that the county ASCS committee had determined that there had been unauthorized removal of the mortgaged corn. Ex. 17. The committee, therefore, determined that the entire outstanding amount was payable within 10 days. *Id.* The committee's letter also advised Bisson that he could request reconsideration of their decision. *Id.*

A few days later, Bisson's counsel informed the committee that Bisson was commencing a suit against Yost for corn which Yost had allegedly removed and for which he had not paid. Ex. 18. The committee deferred further action on collecting Bisson's debt, apparently in order to allow Bisson to pursue his claim against Yost. Ex. 23.

Yost subsequently filed a petition in bankruptcy, automatically staying the state court proceedings. 11 U.S.C. § 362; Ex. 64. On March 22, 1982, the county committee again demanded immediate payment within 10 days. Ex. 23. The letter advised Bisson that his anticipated theft claim would be considered later. *Id.*

On March 25, 1982, Bisson made a formal claim for insurance proceeds which he alleged were due him pursuant to the loan agreement. Ex. 24. The county ASCS committee denied his theft claim by letter dated September 10, 1982. Ex. 33. Bisson was again notified of his right to request a reconsideration. *Id.* Upon reconsideration, the county committee affirmed its earlier decision and notified Bisson of his right to appeal to the state ASCS committee. Ex. 36.

Bisson made a timely appeal to the state committee, which was denied. Ex. 40. Bisson was also informed of his right to appeal to the deputy administrator. *Id.* Bisson took no further action and his time to appeal expired. TT 337, 340.

## DISCUSSION

### Government's Claim

The government seeks to recover the outstanding principal and interest due on Bisson's December 7, 1979 loan, plus unearned reserve storage payments.[4] Bisson

---

3. There is some dispute whether Bisson received proper authorization from the CCC prior to making these sales. It is also not clear whether Bisson applied all the proceeds from every sale to his outstanding loan. Given the court's holding on exhaustion, it is not necessary to make more specific findings.

4. The government computes the amount due it as follows:

| | |
|---|---|
| Principal ............................ $27,056.08 | |
| Interest on $27,056.08 @ 9% from 12/7/79 to 7/7/80 ... | $ 1421.00 |
| Principal (Additional Disbursement) ............................ $ 6,300.00 | |
| Interest on $6300.00 @ 9% from 1/25/80 to 7/7/80 ... | $ 254.76 |
| Total Principal ................... $33,356.08 | |
| Total Interest to 7/7/80 ..... | $ 1675.76 |

| | |
|---|---|
| Interest on $33,356.08 @ 15.25% from 4/16/81 to 2/4/83 ............................... | $ 9184.12 |
| Storage Refund ................... $ 4,705.39 | |
| Total Principal plus Storage Refund .............................. $38,061.47 | |
| Interest on $38,061.47 @ 15.25% from 2/4/83 to 3/7/86 ............................... | $17,922.00 |
| TOTAL PRINCIPAL ............. $38,061.47 | |
| TOTAL INTEREST ............... | $28,781.88 |
| | $66,843.35 |

Daily interest accrual factor of $15.902384

does not dispute that as of July 7, 1980, he owed the CCC principal in the amount of $33,356.08 and interest of $1,675.76. Ex. 74. The government also claims that interest began to accrue on April 16, 1981, the day after the date the loan was called, at the rate of 15.25%. Bisson's only argument in rebuttal is that he is entitled to have the principal amount of the loan forgiven and thus is not liable for this additional interest. *See* TT 54.

Bisson similarly disputes the amount of unearned storage payments which he must refund to the CCC. The regulations governing storage payments provide that

> *[n]o storage payment* shall be earned if the producer (1) has made any false representation in the loan documents in obtaining the loan or in settlement of the loan, (2) makes an unauthorized disposition of the commodity with intent to defraud CCC, (3) abandons the commodity, or (4) negligently or otherwise impairs the commodity.

7 CFR § 1421.540(e) (emphasis added); Ex. 4. The government contends that since the CCC determined there had been unauthorized removal of the commodity, Bisson is liable for the entire 28 cent per bushel[5] advance storage payment times the number of bushels missing.[6] Although it is not clear,[7] Bisson apparently claims he earned storage payments up to the time the missing corn was discovered, and thus is only liable for a partial refund.

**5.** *See* footnote 2, *supra.*

**6.** Both parties agree that for purposes of determining storage refund liability the amount of corn missing is 16,618 bushels. Ex. 42, 74.

**7.** Bisson asserts that he is only liable for 19.82 cents per bushel. That figure was derived from the storage refund calculated by the CCC on a partial repayment made by Bisson on June 17, 1982. Ex. 31.

**8.** The court seriously doubts that the agreement provides for anything more than "forgiveness" of the outstanding loan. Bisson first asserts that the language of the contract which provides that the CCC will "assume" a loss amounts to an agreement to provide insurance against a loss. The contract provides that it is made subject to

### Bisson's Claims

Bisson does not dispute that there is an outstanding balance due on his loan, but rather that he is entitled to have the outstanding amount forgiven and to recover insurance proceeds which he asserts are provided for in the loan agreement. Paragraph 6(j) of the loan agreement provides as follows:

> The producer is responsible for any loss in quantity or quality of the commodity placed under farm-storage loan. Notwithstanding the foregoing, and subject to Program Regulations relating to insurance on farm storage loans and limitation of losses, physical loss or damage occurring after disbursement of the loan funds will be assumed by CCC ... *if the producer established* [sic] *to the satisfaction of CCC* each of the following conditions: (1) the physical loss or damage occurred without fault, negligence or conversion on the part of the producer, or any other person having control of the storage structure; (2) The physical loss or damage resulted solely from an external cause ... such as theft ...; (3) The producer has given the the county committee immediate notice of such loss or damage; and (4) The producer has made no fraudulent representation in the loan documents or in obtaining the loan.

Bisson asserts that a claim of theft entitles him to forgiveness of the outstanding debt plus the "settlement value" of any missing bushels beyond those necessary to secure the loan.[8]

program regulations. Ex. 2, ¶ 6(a). The regulation from which the lost quantity provision of the agreement was derived provides that the CCC will "assume" any physical loss of the commodity, but only "up to a quantity not in excess of that required to secure the outstanding loan...." 7 CRF § 1421.15.

Bisson also seizes on language in the lost quantity paragraph of the agreement providing that it is "subject to Program Regulations relating to insurance ..." as evidence of an intent on the part of CCC to provide insurance. The language cited by Bisson refers to 7 CFR § 1421.13, which provides as follows:

> CCC does not require the producer to insure the commodity placed under a farm storage loan, however, if the producer insures such commodity and an indemnity is paid thereon,

The court will not reach the merits of Bisson's claims, however, because he failed to exhaust his administrative remedies. The regulations governing the ASCS and CCC crop loan programs, 7 CFR § 780.1, clearly delineate a 3 step appeal process. *Id.* at §§ 780.3–780.5. Bisson pursued his appeal through 2 levels, but conceded, TT 340, that he failed to seek review by the Deputy Administrator. 7 CFR § 780.5

It is fundamental that exhaustion of available administrative remedies is a prerequisite to judicial review. *Myers v. Bethlehem Shipbuilding Corp.,* 303 U.S. 41, 50–51, 58 S.Ct. 459, 463–464, 82 L.Ed. 638 (1938); *Delzer Construction Co. v. United States,* 487 F.2d 908, 909 (8th Cir.1973).

The exhaustion requirement serves four primary purposes. [Footnote omitted]. First, it carries out the congressional purpose in granting authority to the agency by discouraging the "frequent and deliberate flouting of administrative processes [that] could ... encourag[e] people to ignore its procedures." [*McKart v. United States,* 395 U.S. 185, 195, 89 S.Ct. 1657, 1663, 23 L.Ed.2d 194 (1969) ]. Second, it protects agency autonomy by allowing the agency the opportunity in the first instance to apply its expertise, exercise whatever discretion it may have been granted, and *correct its own errors.* Third, it aids judicial review by allowing the parties and the agency to develop the facts of the case in the administrative proceeding. Fourth, it promotes judicial economy by avoiding needless repetition of administrative and judicial factfinding, and by perhaps avoiding the necessity of any judicial involvement at all, if the parties successfully vindicate their claims before the agency.

[*See generally McKart,* 395 U.S. 185, 89 S.Ct. 1657].

*Andrade v. Lauer,* 729 F.2d 1475, 1484 (D.C.Cir.1984) (emphasis added).

The purposes of the exhaustion doctrine would best be served by requiring Bisson to take all of the appeals provided by the agency. To do otherwise would "encourage people to ignore" the appeal process set up by the agency. *Andrade,* 729 F.2d at 1484, and thus destroy its usefulness. Further, the need for judicial review might have been eliminated if the agency had been given all the opportunities available to "correct its own error," if any existed.[9] *Andrade,* 729 F.2d at 1484. *See Jordan v. United States,* 522 F.2d 1128, 1131–32 (8th Cir.1975).

Bisson claims his counterclaim is compulsory and must be asserted now or be forever barred. F.R.Civ.P. 13; *Baker v. Gold Seal Liquors, Inc.,* 417 U.S. 467, 469, 94 S.Ct. 2504, 2505, 41 L.Ed.2d 243 (1974). Such a reading of Rule 13, however, would eviscerate the exhaustion doctrine. The policies enunciated in *Andrade* also work strongly in favor of a finding that Rule 13 does not override the exhaustion doctrine. The court finds that, in least in the circumstances of this case, the need to enforce the exhaustion rule is paramount.

Finally, Bisson argues that his failure to exhaust administrative remedies should somehow be excused because he misunderstood the state ASCS committee's letter which affirmed the county committee's decision. The last paragraph of that letter stated as follows: "If you feel that the facts have not been properly considered in this matter, you may appeal within 15 days of the date of this letter to [the Deputy

such indemnity shall innure to the benefit of the CCC....

The regulation cited above says nothing about insurance provided by the CCC. Further, the inference is that insurance is not provided by the CCC, because there would be little incentive for the producer to purchase private insurance if the CCC provided some insurance within the loan agreement.

The court seriously doubts that the loan agreement was intended to provide insurance

on lost commodities. The court's ruling on exhaustion of administrative remedies obviates the need for a decision on the insurance issue, however, and therefore none is made.

9. Both the county and state ASCS committees are comprised of producers. These committees, made up of farmers, seem particularly wellsuited to exercise the discretion given them to determine whether the claiming producer acted reasonably. *See Andrade,* 729 F.2d at 1484.

Administrator]." Bisson argues that because the notice of his right to appeal was phrased with a permissive "may," he thought he did not have to appeal and that failure to do so would result in the order becoming "final" and thus ripe for judicial review.

The language of the letter was obviously intended to inform Bisson that he had a right to appeal, but that he did not have to take it if, for whatever reason, he did not wish to do so. Bisson apparently would have the ASCS explain the exhaustion doctrine when informing producers of their right to appeal. Although such an explanation may be appropriate with some producers who may not even be aware of the general availability of judicial review, it seems unnecessary with a well-educated producer such as Bisson[10], who was represented by counsel.[11]

Since Bisson failed to exhaust his administrative remedies, he is not now entitled to challenge the CCC's decisions adverse to him.[12] The CCC made a determination that Bisson had at least been negligent in his handling of the mortgaged commodity. Bisson did not take advantage of all the appeals available to him, and therefore cannot challenge that ruling.[13] The government is thus entitled to judgment consistent with the CCC's determination.[14]

## CONCLUSION

The CCC, through the ASCS, made a determination that Bisson had acted improperly in his handling of the corn mortgaged to the CCC. Bisson did not exhaust his administrative remedies, and thus is not entitled to challenge that determination

here. The government is entitled to judgment consistent with the CCC's determination.

Judgment will be entered accordingly.

This memorandum constitutes the court's findings of fact and conclusions of law.

---

**10.** Bisson has a degree in accounting from the University of South Dakota. TT 87.

**11.** The letter from the state ASCS committee indicates that a copy was sent to Bisson's counsel.

**12.** Prior to trial, the court entered an order denying the government's motion to dismiss Bisson's counterclaim. The government renewed that motion in its post-trial briefing. Upon reconsideration, the court has determined that the government's position is correct. Vacating the prior ruling does not prejudice Bisson, because

his right to appeal to the Deputy Administrator expired long before this suit was filed.

**13.** The contract itself supports this reasoning. It specifically provides that Bisson must prove his right to "forgiveness" to "the satisfaction of the CCC...." Ex. 2, ¶ 6(j). That language gives the CCC the first opportunity to determine the merits of the producer's claim, subject to CCC regulations, *id.* at ¶ 6(a), including those relating to appeals.

**14.** See footnote 4, *supra.*